# PLYLER, SUPERINTENDENT, TYLER INDEPENDENT SCHOOL DISTRICT, ET AL. *v.* DOE, GUARDIAN, ET AL.

No. 80–1538.   Argued December 1, 1981—Decided June 15, 1982*

---

*Together with No. 80–1934, *Texas et al.* v. *Certain Named and Unnamed Undocumented Alien Children et al.*, also on appeal from the same court.

BRENNAN, J., delivered the opinion of the Court, in which MARSHALL, BLACKMUN, POWELL, and STEVENS, JJ., joined. MARSHALL, J., *post*, p. 230, BLACKMUN, J., *post*, p. 231, and POWELL, J., *post*, p. 236, filed concurring opinions. BURGER, C. J., filed a dissenting opinion, in which WHITE, REHNQUIST, and O'CONNOR, JJ., joined, *post*, p. 242.

*John C. Hardy* argued the cause for appellants in No. 80–1538. *Richard Arnett*, Assistant Attorney General of Texas, argued the cause for appellants in No. 80–1934. With them on the briefs were *Mark White*, Attorney General, *John W. Fainter, Jr.*, First Assistant Attorney General, and *Richard E. Gray III*, Executive Assistant Attorney General.

*Peter D. Roos* argued the cause for appellees in No. 80–1538. With him on the brief were *Larry Daves* and *Vilma S. Martinez*. *Peter A. Schey* argued the cause for appellees in No. 80–1934. With him on the briefs were *Al Campos*, *Larry Mealer*, and *Jane Swanson*.

*Solicitor General Lee, Assistant Attorney General Reynolds*, and *Edwin S. Kneedler* filed a brief for the United States in No. 80–1934 and for the United States as *amicus curiae* in No. 80–1538.†

---

†Briefs of *amici curiae* urging reversal in both bases were filed by *Travis Hiester, Orrin W. Johnson, Neal King*, and *Tony Martinez* for the Harlingen Consolidated Independent School District et al.; and by *John S. Aldridge* for the Texas Association of School Boards. *Ronald A. Zumbrun* and *John H. Findley* filed a brief for the Pacific Legal Foundation as *amicus curiae* urging reversal in No. 80–1538.

Briefs of *amici curiae* urging affirmance in both cases were filed by *James J. Orlow* for the American Immigration Lawyers Association; by *Samuel Rabinove* for the American Jewish Committee; by *Bill Lann Lee* for the Asian American Legal Defense and Education Fund; by the Edgewood Independent School District; by *Peter B. Sandmann* for the Legal Aid Society of San Francisco; by *Michael K. Suarez* for the Mexican American Bar Association of Houston; by *Robert J. Kenney, Jr.*, for the National Education Association et al.; by *Fred Fuchs* for Texas Impact; and by *Daniel Marcus* and *John F. Cooney* for the Washington Lawyers' Committee for Civil Rights Under Law et al. *Thomas M. Griffin* filed a brief for the California State Board of Education as *amicus curiae* urging affirmance in No. 80–1538.

Briefs of *amici curiae* in both cases were filed by *Joseph C. Zengerle* for the Federation for American Immigration Reform; by *David Crump* for the Legal Foundation of America; and by *Roger J. Marzulla* and *Maxwell A. Miller* for the Mountain States Legal Foundation.

Briefs of *amici curiae* in No. 80–1934 were filed by *Joyce D. Miller* for the American Friends Service Committee et al.; and by *Gwendolyn H.*

JUSTICE BRENNAN delivered the opinion of the Court.

The question presented by these cases is whether, consistent with the Equal Protection Clause of the Fourteenth Amendment, Texas may deny to undocumented school-age children the free public education that it provides to children who are citizens of the United States or legally admitted aliens.

I

Since the late 19th century, the United States has restricted immigration into this country. Unsanctioned entry into the United States is a crime, 8 U. S. C. § 1325, and those who have entered unlawfully are subject to deportation, 8 U. S. C. §§ 1251, 1252 (1976 ed. and Supp. IV). But despite the existence of these legal restrictions, a substantial number of persons have succeeded in unlawfully entering the United States, and now live within various States, including the State of Texas.

In May 1975, the Texas Legislature revised its education laws to withhold from local school districts any state funds for the education of children who were not "legally admitted" into the United States. The 1975 revision also authorized local school districts to deny enrollment in their public schools to children not "legally admitted" to the country. Tex. Educ. Code Ann. § 21.031 (Vernon Supp. 1981).[1] These cases involve constitutional challenges to those provisions.

---

*Gregory, Thomas A. Shannon,* and *August W. Steinhilber* for the National School Boards Association.

[1] That section provides, in pertinent part:

"(a) All children who are citizens of the United States or legally admitted aliens and who are over the age of five years and under the age of 21 years on the first day of September of any scholastic year shall be entitled to the benefits of the Available School Fund for that year.

"(b) Every child in this state who is a citizen of the United States or a legally admitted alien and who is over the age of five years and not over the age of 21 years on the first day of September of the year in which admission is sought shall be permitted to attend the public free schools of the district

*No. 80–1538*

*Plyler* v. *Doe*

This is a class action, filed in the United States District Court for the Eastern District of Texas in September 1977, on behalf of certain school-age children of Mexican origin residing in Smith County, Tex., who could not establish that they had been legally admitted into the United States. The action complained of the exclusion of plaintiff children from the public schools of the Tyler Independent School District.[2] The Superintendent and members of the Board of Trustees of the School District were named as defendants; the State of Texas intervened as a party-defendant. After certifying a class consisting of all undocumented school-age children of Mexican origin residing within the School District, the District Court preliminarily enjoined defendants from denying a free education to members of the plaintiff class. In December 1977, the court conducted an extensive hearing on plaintiffs' motion for permanent injunctive relief.

---

in which he resides or in which his parent, guardian, or the person having lawful control of him resides at the time he applies for admission.

"(c) The board of trustees of any public free school district of this state shall admit into the public free schools of the district free of tuition all persons who are either citizens of the United States or legally admitted aliens and who are over five and not over 21 years of age at the beginning of the scholastic year if such person or his parent, guardian or person having lawful control resides within the school district."

[2] Despite the enactment of § 21.031 in 1975, the School District had continued to enroll undocumented children free of charge until the 1977–1978 school year. In July 1977, it adopted a policy requiring undocumented children to pay a "full tuition fee" in order to enroll. Section 21.031 had not provided a definition of "a legally admitted alien." Tyler offered the following clarification:

"A legally admitted alien is one who has documentation that he or she is legally in the United States, or a person who is in the process of securing documentation from the United States Immigration Service, and the Service will state that the person is being processed and will be admitted with proper documentation." App. to Juris. Statement in No. 80–1538, p. A–38.

In considering this motion, the District Court made extensive findings of fact. The court found that neither § 21.031 nor the School District policy implementing it had "either the purpose or effect of keeping illegal aliens out of the State of Texas." 458 F. Supp. 569, 575 (1978). Respecting defendants' further claim that § 21.031 was simply a financial measure designed to avoid a drain on the State's fisc, the court recognized that the increases in population resulting from the immigration of Mexican nationals into the United States had created problems for the public schools of the State, and that these problems were exacerbated by the special educational needs of immigrant Mexican children. The court noted, however, that the increase in school enrollment was primarily attributable to the admission of children who were legal residents. *Id.*, at 575–576. It also found that while the "exclusion of all undocumented children from the public schools in Texas would eventually result in economies at some level," *id.*, at 576, funding from both the State and Federal Governments was based primarily on the number of children enrolled. In net effect then, barring undocumented children from the schools would save money, but it would "not necessarily" improve "the quality of education." *Id.*, at 577. The court further observed that the impact of § 21.031 was borne primarily by a very small subclass of illegal aliens, "entire families who have migrated illegally and—for all practical purposes—permanently to the United States." *Id.*, at 578.[3] Finally, the court noted that under current laws and practices "the illegal alien of today may well be the legal alien of tomorrow,"[4] and that without an education, these undocu-

---

[3] The court contrasted this group with those illegal aliens who entered the country alone in order to earn money to send to their dependents in Mexico, and who in many instances remained in this country for only a short period of time. 458 F. Supp., at 578.

[4] Plaintiffs' expert, Dr. Gilbert Cardenas, testified that "fifty to sixty per cent . . . of current legal alien workers were formerly illegal aliens." *Id.*, at 577. A defense witness, Rolan Heston, District Director of the Hous-

mented children, "[a]lready disadvantaged as a result of poverty, lack of English-speaking ability, and undeniable racial prejudices, . . . will become permanently locked into the lowest socio-economic class." *Id.*, at 577.

The District Court held that illegal aliens were entitled to the protection of the Equal Protection Clause of the Fourteenth Amendment, and that § 21.031 violated that Clause. Suggesting that "the state's exclusion of undocumented children from its public schools . . . may well be the type of invidiously motivated state action for which the suspect classification doctrine was designed," the court held that it was unnecessary to decide whether the statute would survive a "strict scrutiny" analysis because, in any event, the discrimination embodied in the statute was not supported by a rational basis. *Id.*, at 585. The District Court also concluded that the Texas statute violated the Supremacy Clause.[5] *Id.*, at 590–592.

The Court of Appeals for the Fifth Circuit upheld the District Court's injunction. 628 F. 2d 448 (1980). The Court of Appeals held that the District Court had erred in finding the Texas statute pre-empted by federal law.[6] With respect to

---

ton District of the Immigration and Naturalization Service, testified that "undocumented children can and do live in the United States for years, and adjust their status through marriage to a citizen or permanent resident." *Ibid.* The court also took notice of congressional proposals to "legalize" the status of many unlawful entrants. *Id.*, at 577–578. See also n. 17, *infra.*

[5] The court found § 21.031 inconsistent with the scheme of national regulation under the Immigration and Nationality Act, and with federal laws pertaining to funding and discrimination in education. The court distinguished *De Canas* v. *Bica,* 424 U. S. 351 (1976), by emphasizing that the state bar on employment of illegal aliens involved in that case mirrored precisely the federal policy, of protecting the domestic labor market, underlying the immigration laws. The court discerned no express federal policy to bar illegal immigrants from education. 458 F. Supp., at 590–592.

[6] The Court of Appeals noted that *De Canas* v. *Bica, supra,* had not foreclosed all state regulation with respect to illegal aliens, and found no express or implied congressional policy favoring the education of illegal aliens. The court therefore concluded that there was no pre-emptive conflict between state and federal law. 628 F. 2d, at 451–454.

equal protection, however, the Court of Appeals affirmed in all essential respects the analysis of the District Court, *id.*, at 454–458, concluding that § 21.031 was "constitutionally infirm regardless of whether it was tested using the mere rational basis standard or some more stringent test," *id.*, at 458. We noted probable jurisdiction. 451 U. S. 968 (1981).

### No. 80–1934

### *In re Alien Children Education Litigation*

During 1978 and 1979, suits challenging the constitutionality of § 21.031 and various local practices undertaken on the authority of that provision were filed in the United States District Courts for the Southern, Western, and Northern Districts of Texas. Each suit named the State of Texas and the Texas Education Agency as defendants, along with local officials. In November 1979, the Judicial Panel on Multidistrict Litigation, on motion of the State, consolidated the claims against the state officials into a single action to be heard in the District Court for the Southern District of Texas. A hearing was conducted in February and March 1980. In July 1980, the court entered an opinion and order holding that § 21.031 violated the Equal Protection Clause of the Fourteenth Amendment. *In re Alien Children Education Litigation,* 501 F. Supp. 544.[7] The court held that "the absolute deprivation of education should trigger strict judicial scrutiny, particularly when the absolute deprivation is the result of complete inability to pay for the desired benefit." *Id.,* at 582. The court determined that the State's concern for fiscal integrity was not a compelling state interest, *id.,* at 582–583; that exclusion of these children had not been shown to be necessary to improve education within the State, *id.,* at 583; and that the educational needs of the children statutorily excluded were not different from the needs of children not excluded, *ibid.* The court therefore concluded that

---

[7] The court concluded that § 21.031 was not pre-empted by federal laws or international agreements. 501 F. Supp., at 584–596.

§ 21.031 was not carefully tailored to advance the asserted state interest in an acceptable manner. *Id.*, at 583–584. While appeal of the District Court's decision was pending, the Court of Appeals rendered its decision in No. 80–1538. Apparently on the strength of that opinion, the Court of Appeals, on February 23, 1981, summarily affirmed the decision of the Southern District. We noted probable jurisdiction, 452 U. S. 937 (1981), and consolidated this case with No. 80–1538 for briefing and argument.[8]

## II

The Fourteenth Amendment provides that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law; nor deny to *any person within its jurisdiction* the equal protection of the laws." (Emphasis added.) Appellants argue at the outset that undocumented aliens, because of their immigration status, are not "persons within the jurisdiction" of the State of Texas, and that they therefore have no right to the equal protection of Texas law. We reject this argument. Whatever his status under the immigration laws, an alien is surely a "person" in any ordinary sense of that term. Aliens, even aliens whose presence in this country is unlawful, have long been recognized as "persons" guaranteed due process of law by the Fifth and Fourteenth Amendments. *Shaughnessy* v. *Mezei,* 345 U. S. 206, 212 (1953); *Wong Wing* v. *United States,* 163 U. S. 228, 238 (1896); *Yick Wo* v. *Hopkins,* 118 U. S. 356, 369 (1886). Indeed, we have clearly held that the Fifth Amendment protects aliens whose presence in this country is unlawful from invidious discrimination by the Federal Government. *Mathews* v. *Diaz,* 426 U. S. 67, 77 (1976).[9]

---

[8] Appellees in both cases continue to press the argument that § 21.031 is pre-empted by federal law and policy. In light of our disposition of the Fourteenth Amendment issue, we have no occasion to reach this claim.

[9] It would be incongruous to hold that the United States, to which the Constitution assigns a broad authority over both naturalization and foreign affairs, is barred from invidious discrimination with respect to unlawful

Appellants seek to distinguish our prior cases, emphasizing that the Equal Protection Clause directs a State to afford its protection to persons *within its jurisdiction* while the Due Process Clauses of the Fifth and Fourteenth Amendments contain no such assertedly limiting phrase. In appellants' view, persons who have entered the United States illegally are not "within the jurisdiction" of a State even if they are present within a State's boundaries and subject to its laws. Neither our cases nor the logic of the Fourteenth Amendment supports that constricting construction of the phrase "within its jurisdiction."[10] We have never suggested that the class of persons who might avail themselves of the equal protection guarantee is less than coextensive with that entitled to due process. To the contrary, we have recognized

---

aliens, while exempting the States from a similar limitation. See 426 U. S., at 84–86.

[10] Although we have not previously focused on the intended meaning of this phrase, we have had occasion to examine the first sentence of the Fourteenth Amendment, which provides that "[a]ll persons born or naturalized in the United States, and *subject to the jurisdiction thereof*, are citizens of the United States . . . ." (Emphasis added.) Justice Gray, writing for the Court in *United States* v. *Wong Kim Ark*, 169 U. S. 649 (1898), detailed at some length the history of the Citizenship Clause, and the predominantly geographic sense in which the term "jurisdiction" was used. He further noted that it was "impossible to construe the words 'subject to the jurisdiction thereof,' in the opening sentence [of the Fourteenth Amendment], as less comprehensive than the words 'within its jurisdiction,' in the concluding sentence of the same section; or to hold that persons 'within the jurisdiction' of one of the States of the Union are not 'subject to the jurisdiction of the United States.'" *Id.*, at 687.

Justice Gray concluded that "[e]very citizen or subject of another country, while domiciled here, is within the allegiance and the protection, and consequently subject to the jurisdiction, of the United States." *Id.*, at 693. As one early commentator noted, given the historical emphasis on geographic territoriality, bounded only, if at all, by principles of sovereignty and allegiance, no plausible distinction with respect to Fourteenth Amendment "jurisdiction" can be drawn between resident aliens whose entry into the United States was lawful, and resident aliens whose entry was unlawful. See C. Bouvé, Exclusion and Expulsion of Aliens in the United States 425–427 (1912).

that both provisions were fashioned to protect an identical class of persons, and to reach every exercise of state authority.

> "The Fourteenth Amendment to the Constitution is not confined to the protection of citizens. It says: 'Nor shall any state deprive any person of life, liberty, or property without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.' *These provisions are universal in their application, to all persons within the territorial jurisdiction,* without regard to any differences of race, of color, or of nationality; and the protection of the laws is a pledge of the protection of equal laws." *Yick Wo, supra,* at 369 (emphasis added).

In concluding that "all persons within the territory of the United States," including aliens unlawfully present, may invoke the Fifth and Sixth Amendments to challenge actions of the Federal Government, we reasoned from the understanding that the Fourteenth Amendment was designed to afford its protection to all within the boundaries of a State. *Wong Wing, supra,* at 238.[11] Our cases applying the Equal Protection Clause reflect the same territorial theme:[12]

---

[11] In his separate opinion, Justice Field addressed the relationship between the Fifth and Fourteenth Amendments:

"The term 'person,' used in the Fifth Amendment, is broad enough to include any and every human being within the jurisdiction of the republic. A resident, alien born, is entitled to the same protection under the laws that a citizen is entitled to. He owes obedience to the laws of the country in which he is domiciled, and, as a consequence, he is entitled to the equal protection of those laws. . . . The contention that persons within the territorial jurisdiction of this republic might be beyond the protection of the law was heard with pain on the argument at the bar—in face of the great constitutional amendment which declares that no State shall deny to any person within its jurisdiction the equal protection of the laws." *Wong Wing* v. *United States,* 163 U. S., at 242–243 (concurring in part and dissenting in part).

[12] *Leng May Ma* v. *Barber,* 357 U. S. 185 (1958), relied on by appellants, is not to the contrary. In that case the Court held, as a matter of statu-

> "Manifestly, the obligation of the State to give the protection of equal laws can be performed only where its laws operate, that is, within its own jurisdiction. It is there that the equality of legal right must be maintained. That obligation is imposed by the Constitution upon the States severally as governmental entities,—each responsible for its own laws establishing the rights and duties of persons within its borders." *Missouri ex rel. Gaines v. Canada,* 305 U. S. 337, 350 (1938).

There is simply no support for appellants' suggestion that "due process" is somehow of greater stature than "equal protection" and therefore available to a larger class of persons. To the contrary, each aspect of the Fourteenth Amendment reflects an elementary limitation on state power. To permit a State to employ the phrase "within its jurisdiction" in order to identify subclasses of persons whom it would define as beyond its jurisdiction, thereby relieving itself of the obligation to assure that its laws are designed and applied equally to those persons, would undermine the principal purpose for which the Equal Protection Clause was incorporated in the Fourteenth Amendment. The Equal Protection Clause was intended to work nothing less than the abolition of all caste-based and invidious class-based legislation. That objective is fundamentally at odds with the power the State asserts here to classify persons subject to its laws as nonetheless excepted from its protection.

---

tory construction, that an alien paroled into the United States pursuant to § 212(d)(5) of the Immigration and Nationality Act, 8 U. S. C. § 1182(d)(5) (1952 ed.), was not "within the United States" for the purpose of availing herself of § 243(h), which authorized the withholding of deportation in certain circumstances. The conclusion reflected the longstanding distinction between exclusion proceedings, involving the determination of admissibility, and deportation proceedings. The undocumented children who are appellees here, unlike the parolee in *Leng May Ma, supra,* could apparently be removed from the country only pursuant to deportation proceedings. 8 U. S. C. § 1251(a)(2). See 1A C. Gordon & H. Rosenfield, Immigration Law and Procedure § 3.16b, p. 3–161 (1981).

Although the congressional debate concerning § 1 of the Fourteenth Amendment was limited, that debate clearly confirms the understanding that the phrase "within its jurisdiction" was intended in a broad sense to offer the guarantee of equal protection to all within a State's boundaries, and to all upon whom the State would impose the obligations of its laws. Indeed, it appears from those debates that Congress, by using the phrase "person within its jurisdiction," sought expressly to ensure that the equal protection of the laws was provided to the alien population. Representative Bingham reported to the House the draft resolution of the Joint Committee of Fifteen on Reconstruction (H. R. 63) that was to become the Fourteenth Amendment.[18] Cong. Globe, 39th Cong., 1st Sess., 1033 (1866). Two days later, Bingham posed the following question in support of the resolution:

> "Is it not essential to the unity of the people that the citizens of each State shall be entitled to all the privileges and immunities of citizens in the several States? Is it not essential to the unity of the Government and the unity of the people that all persons, *whether citizens or strangers, within this land,* shall have equal protection in every State in this Union in the rights of life and liberty and property?" *Id.,* at 1090.

Senator Howard, also a member of the Joint Committee of Fifteen, and the floor manager of the Amendment in the Senate, was no less explicit about the broad objectives of the Amendment, and the intention to make its provisions applicable to all who "may happen to be" within the jurisdiction of a State:

---

[18] Representative Bingham's views are also reflected in his comments on the Civil Rights Bill of 1866. He repeatedly referred to the need to provide protection, not only to the freedmen, but to "the alien and stranger," and to "refugees . . . and all men." Cong. Globe, 39th Cong., 1st Sess., 1292 (1866).

"The last two clauses of the first section of the amendment disable a State from depriving not merely a citizen of the United States, but *any person, whoever he may be,* of life, liberty, or property without due process of law, or from denying to him the equal protection of the laws of the State. This abolishes all class legislation in the States and does away with the injustice of subjecting one caste of persons to a code not applicable to another. . . . It will, if adopted by the States, forever disable every one of them from passing laws trenching upon those fundamental rights and privileges which pertain to citizens of the United States, *and to all persons who may happen to be within their jurisdiction."* *Id.,* at 2766 (emphasis added).

Use of the phrase "within its jurisdiction" thus does not detract from, but rather confirms, the understanding that the protection of the Fourteenth Amendment extends to anyone, citizen or stranger, who *is* subject to the laws of a State, and reaches into every corner of a State's territory. That a person's initial entry into a State, or into the United States, was unlawful, and that he may for that reason be expelled, cannot negate the simple fact of his presence within the State's territorial perimeter. Given such presence, he is subject to the full range of obligations imposed by the State's civil and criminal laws. And until he leaves the jurisdiction—either voluntarily, or involuntarily in accordance with the Constitution and laws of the United States—he is entitled to the equal protection of the laws that a State may choose to establish.

Our conclusion that the illegal aliens who are plaintiffs in these cases may claim the benefit of the Fourteenth Amendment's guarantee of equal protection only begins the inquiry. The more difficult question is whether the Equal Protection Clause has been violated by the refusal of the State of Texas to reimburse local school boards for the education of children who cannot demonstrate that their presence within the

United States is lawful, or by the imposition by those school boards of the burden of tuition on those children. It is to this question that we now turn.

## III

The Equal Protection Clause directs that "all persons similarly circumstanced shall be treated alike." *F. S. Royster Guano Co.* v. *Virginia*, 253 U. S. 412, 415 (1920). But so too, "[t]he Constitution does not require things which are different in fact or opinion to be treated in law as though they were the same." *Tigner* v. *Texas*, 310 U. S. 141, 147 (1940). The initial discretion to determine what is "different" and what is "the same" resides in the legislatures of the States. A legislature must have substantial latitude to establish classifications that roughly approximate the nature of the problem perceived, that accommodate competing concerns both public and private, and that account for limitations on the practical ability of the State to remedy every ill. In applying the Equal Protection Clause to most forms of state action, we thus seek only the assurance that the classification at issue bears some fair relationship to a legitimate public purpose.

But we would not be faithful to our obligations under the Fourteenth Amendment if we applied so deferential a standard to every classification. The Equal Protection Clause was intended as a restriction on state legislative action inconsistent with elemental constitutional premises. Thus we have treated as presumptively invidious those classifications that disadvantage a "suspect class," [14] or that impinge upon

---

[14] *Several formulations might explain our treatment of certain classifications as "suspect."* Some classifications are more likely than others to reflect deep-seated prejudice rather than legislative rationality in pursuit of some legitimate objective. Legislation predicated on such prejudice is easily recognized as incompatible with the constitutional understanding that each person is to be judged individually and is entitled to equal justice

the exercise of a "fundamental right."[15]  With respect to such classifications, it is appropriate to enforce the mandate of equal protection by requiring the State to demonstrate that its classification has been precisely tailored to serve a compelling governmental interest.  In addition, we have recognized that certain forms of legislative classification, while not facially invidious, nonetheless give rise to recurring constitutional difficulties; in these limited circumstances we have sought the assurance that the classification reflects a reasoned judgment consistent with the ideal of equal protection by inquiring whether it may fairly be viewed as furthering a

---

under the law.  Classifications treated as suspect tend to be irrelevant to any proper legislative goal.  See *McLaughlin* v. *Florida*, 379 U. S. 184, 192 (1964); *Hirabayashi* v. *United States*, 320 U. S. 81, 100 (1943).  Finally, certain groups, indeed largely the same groups, have historically been "relegated to such a position of political powerlessness as to command extraordinary protection from the majoritarian political process." *San Antonio Independent School Dist.* v. *Rodriguez*, 411 U. S. 1, 28 (1973); *Graham* v. *Richardson*, 403 U. S. 365, 372 (1971); see *United States* v. *Carolene Products Co.*, 304 U. S. 144, 152–153, n. 4 (1938).  The experience of our Nation has shown that prejudice may manifest itself in the treatment of some groups.  Our response to that experience is reflected in the Equal Protection Clause of the Fourteenth Amendment.  Legislation imposing special disabilities upon groups disfavored by virtue of circumstances beyond their control suggests the kind of "class or caste" treatment that the Fourteenth Amendment was designed to abolish.

[15] In determining whether a class-based denial of a particular right is deserving of strict scrutiny under the Equal Protection Clause, we look to the Constitution to see if the right infringed has its source, explicitly or implicitly, therein.  But we have also recognized the fundamentality of participation in state "elections on an equal basis with other citizens in the jurisdiction," *Dunn* v. *Blumstein*, 405 U. S. 330, 336 (1972), even though "the right to vote, *per se*, is not a constitutionally protected right." *San Antonio Independent School Dist.*, *supra*, at 35, n. 78.  With respect to suffrage, we have explained the need for strict scrutiny as arising from the significance of the franchise as the guardian of all other rights.  See *Harper* v. *Virginia Bd. of Elections*, 383 U. S. 663, 667 (1966); *Reynolds* v. *Sims*, 377 U. S. 533, 562 (1964); *Yick Wo* v. *Hopkins*, 118 U. S. 356, 370 (1886).

substantial interest of the State.[16]   We turn to a consideration of the standard appropriate for the evaluation of § 21.031.

## A

Sheer incapability or lax enforcement of the laws barring entry into this country, coupled with the failure to establish an effective bar to the employment of undocumented aliens, has resulted in the creation of a substantial "shadow population" of illegal migrants—numbering in the millions—within our borders.[17]   This situation raises the specter of a perma-

---

[16] See *Craig* v. *Boren*, 429 U. S. 190 (1976); *Lalli* v. *Lalli*, 439 U. S. 259 (1978).   This technique of "intermediate" scrutiny permits us to evaluate the rationality of the legislative judgment with reference to well-settled constitutional principles.   "In expounding the Constitution, the Court's role is to discern 'principles sufficiently absolute to give them roots throughout the community and continuity over significant periods of time, and to lift them above the level of the pragmatic political judgments of a particular time and place.'"   *University of California Regents* v. *Bakke*, 438 U. S. 265, 299 (1978) (opinion of POWELL, J.), quoting A. Cox, The Role of the Supreme Court in American Government 114 (1976).   Only when concerns sufficiently absolute and enduring can be clearly ascertained from the Constitution and our cases do we employ this standard to aid us in determining the rationality of the legislative choice.

[17] The Attorney General recently estimated the number of illegal aliens within the United States at between 3 and 6 million.   In presenting to both the Senate and House of Representatives several Presidential proposals for reform of the immigration laws—including one to "legalize" many of the illegal entrants currently residing in the United States by creating for them a special status under the immigration laws—the Attorney General noted that this subclass is largely composed of persons with a permanent attachment to the Nation, and that they are unlikely to be displaced from our territory:

"We have neither the resources, the capability, nor the motivation to uproot and deport millions of illegal aliens, many of whom have become, in effect, members of the community.   By granting limited legal status to the productive and law-abiding members of this shadow population, we will recognize reality and devote our enforcement resources to deterring future illegal arrivals."   Joint Hearing before the Subcommittee on Immigration, Refugees, and International Law of the House Committee on the Judiciary

nent caste of undocumented resident aliens, encouraged by some to remain here as a source of cheap labor, but nevertheless denied the benefits that our society makes available to citizens and lawful residents.[18] The existence of such an underclass presents most difficult problems for a Nation that prides itself on adherence to principles of equality under law.[19]

The children who are plaintiffs in these cases are special members of this underclass. Persuasive arguments support the view that a State may withhold its beneficence from those whose very presence within the United States is the product of their own unlawful conduct. These arguments do not ap-

---

and the Subcommittee on Immigration and Refugee Policy of the Senate Committee on the Judiciary, 97th Cong., 1st Sess., 9 (1981) (testimony of William French Smith, Attorney General).

[18] As the District Court observed in No. 80–1538, the confluence of Government policies has resulted in "the existence of a large number of employed illegal aliens, such as the parents of plaintiffs in this case, whose presence is tolerated, whose employment is perhaps even welcomed, but who are virtually defenseless against any abuse, exploitation, or callous neglect to which the state or the state's natural citizens and business organizations may wish to subject them." 458 F. Supp., at 585.

[19] We reject the claim that "illegal aliens" are a "suspect class." No case in which we have attempted to define a suspect class, see, e. g., n. 14, supra, has addressed the status of persons unlawfully in our country. Unlike most of the classifications that we have recognized as suspect, entry into this class, by virtue of entry into this country, is the product of voluntary action. Indeed, entry into the class is itself a crime. In addition, it could hardly be suggested that undocumented status is a "constitutional irrelevancy." With respect to the actions of the Federal Government, alienage classifications may be intimately related to the conduct of foreign policy, to the federal prerogative to control access to the United States, and to the plenary federal power to determine who has sufficiently manifested his allegiance to become a citizen of the Nation. No State may independently exercise a like power. But if the Federal Government has by uniform rule prescribed what it believes to be appropriate standards for the treatment of an alien subclass, the States may, of course, follow the federal direction. See De Canas v. Bica, 424 U. S. 351 (1976).

ply with the same force to classifications imposing disabilities on the minor *children* of such illegal entrants. At the least, those who elect to enter our territory by stealth and in violation of our law should be prepared to bear the consequences, including, but not limited to, deportation. But the children of those illegal entrants are not comparably situated. Their "parents have the ability to conform their conduct to societal norms," and presumably the ability to remove themselves from the State's jurisdiction; but the children who are plaintiffs in these cases "can affect neither their parents' conduct nor their own status." *Trimble* v. *Gordon,* 430 U. S. 762, 770 (1977). Even if the State found it expedient to control the conduct of adults by acting against their children, legislation directing the onus of a parent's misconduct against his children does not comport with fundamental conceptions of justice.

> "[V]isiting . . . condemnation on the head of an infant is illogical and unjust. Moreover, imposing disabilities on the . . . child is contrary to the basic concept of our system that legal burdens should bear some relationship to individual responsibility or wrongdoing. Obviously, no child is responsible for his birth and penalizing the . . . child is an ineffectual—as well as unjust—way of deterring the parent." *Weber* v. *Aetna Casualty & Surety Co.,* 406 U. S. 164, 175 (1972) (footnote omitted).

Of course, undocumented status is not irrelevant to any proper legislative goal. Nor is undocumented status an absolutely immutable characteristic since it is the product of conscious, indeed unlawful, action. But § 21.031 is directed against children, and imposes its discriminatory burden on the basis of a legal characteristic over which children can have little control. It is thus difficult to conceive of a rational justification for penalizing these children for their presence within the United States. Yet that appears to be precisely the effect of § 21.031.

Public education is not a "right" granted to individuals by the Constitution. *San Antonio Independent School Dist.* v. *Rodriguez*, 411 U. S. 1, 35 (1973). But neither is it merely some governmental "benefit" indistinguishable from other forms of social welfare legislation. Both the importance of education in maintaining our basic institutions, and the lasting impact of its deprivation on the life of the child, mark the distinction. The "American people have always regarded education and [the] acquisition of knowledge as matters of supreme importance." *Meyer* v. *Nebraska*, 262 U. S. 390, 400 (1923). We have recognized "the public schools as a most vital civic institution for the preservation of a democratic system of government," *Abington School District* v. *Schempp*, 374 U. S. 203, 230 (1963) (BRENNAN, J., concurring), and as the primary vehicle for transmitting "the values on which our society rests." *Ambach* v. *Norwick*, 441 U. S. 68, 76 (1979). "[A]s . . . pointed out early in our history, . . . some degree of education is necessary to prepare citizens to participate effectively and intelligently in our open political system if we are to preserve freedom and independence." *Wisconsin* v. *Yoder*, 406 U. S. 205, 221 (1972). And these historic "perceptions of the public schools as inculcating fundamental values necessary to the maintenance of a democratic political system have been confirmed by the observations of social scientists." *Ambach* v. *Norwick, supra*, at 77. In addition, education provides the basic tools by which individuals might lead economically productive lives to the benefit of us all. In sum, education has a fundamental role in maintaining the fabric of our society. We cannot ignore the significant social costs borne by our Nation when select groups are denied the means to absorb the values and skills upon which our social order rests.

In addition to the pivotal role of education in sustaining our political and cultural heritage, denial of education to some isolated group of children poses an affront to one of the goals

of the Equal Protection Clause: the abolition of governmental barriers presenting unreasonable obstacles to advancement on the basis of individual merit.  Paradoxically, by depriving the children of any disfavored group of an education, we foreclose the means by which that group might raise the level of esteem in which it is held by the majority.  But more directly, "education prepares individuals to be self-reliant and self-sufficient participants in society." *Wisconsin* v. *Yoder*, *supra*, at 221.  Illiteracy is an enduring disability.  The inability to read and write will handicap the individual deprived of a basic education each and every day of his life.  The inestimable toll of that deprivation on the social, economic, intellectual, and psychological well-being of the individual, and the obstacle it poses to individual achievement, make it most difficult to reconcile the cost or the principle of a status-based denial of basic education with the framework of equality embodied in the Equal Protection Clause.[20]  What we said 28 years ago in *Brown* v. *Board of Education*, 347 U. S. 483 (1954), still holds true:

> "Today, education is perhaps the most important function of state and local governments.  Compulsory school

---

[20] Because the State does not afford noncitizens the right to vote, and may bar noncitizens from participating in activities at the heart of its political community, appellants argue that denial of a basic education to these children is of less significance than the denial to some other group.  Whatever the current status of these children, the courts below concluded that many will remain here permanently and that some indeterminate number will eventually become citizens.  The fact that many will not is not decisive, even with respect to the importance of education to participation in core political institutions.  "[T]he benefits of education are not reserved to those whose productive utilization of them is a certainty . . . ."  458 F. Supp., at 581, n. 14.  In addition, although a noncitizen "may be barred from full involvement in the political arena, he may play a role—perhaps even a leadership role—in other areas of import to the community." *Nyquist* v. *Mauclet*, 432 U. S. 1, 12 (1977).  Moreover, the significance of education to our society is not limited to its political and cultural fruits. The public schools are an important socializing institution, imparting those shared values through which social order and stability are maintained.

attendance laws and the great expenditures for education both demonstrate our recognition of the importance of education to our democratic society. It is required in the performance of our most basic public responsibilities, even service in the armed forces. It is the very foundation of good citizenship. Today it is a principal instrument in awakening the child to cultural values, in preparing him for later professional training, and in helping him to adjust normally to his environment. In these days, it is doubtful that any child may reasonably be expected to succeed in life if he is denied the opportunity of an education. Such an opportunity, where the state has undertaken to provide it, is a right which must be made available to all on equal terms." *Id.*, at 493.

## B

These well-settled principles allow us to determine the proper level of deference to be afforded § 21.031. Undocumented aliens cannot be treated as a suspect class because their presence in this country in violation of federal law is not a "constitutional irrelevancy." Nor is education a fundamental right; a State need not justify by compelling necessity every variation in the manner in which education is provided to its population. See *San Antonio Independent School Dist. v. Rodriguez, supra*, at 28–39. But more is involved in these cases than the abstract question whether § 21.031 discriminates against a suspect class, or whether education is a fundamental right. Section 21.031 imposes a lifetime hardship on a discrete class of children not accountable for their disabling status. The stigma of illiteracy will mark them for the rest of their lives. By denying these children a basic education, we deny them the ability to live within the structure of our civic institutions, and foreclose any realistic possibility that they will contribute in even the smallest way to the progress of our Nation. In determining

the rationality of § 21.031, we may appropriately take into account its costs to the Nation and to the innocent children who are its victims. In light of these countervailing costs, the discrimination contained in § 21.031 can hardly be considered rational unless it furthers some substantial goal of the State.

## IV

It is the State's principal argument, and apparently the view of the dissenting Justices, that the undocumented status of these children *vel non* establishes a sufficient rational basis for denying them benefits that a State might choose to afford other residents. The State notes that while other aliens are admitted "on an equality of legal privileges with all citizens under non-discriminatory laws," *Takahashi* v. *Fish & Game Comm'n*, 334 U. S. 410, 420 (1948), the asserted right of these children to an education can claim no implicit congressional imprimatur.[21] Indeed, in the State's view, Congress' apparent disapproval of the presence of these children within the United States, and the evasion of the federal regulatory program that is the mark of undocumented status, provides authority for its decision to impose upon them special disabilities. Faced with an equal protection challenge respecting the treatment of aliens, we agree that the courts must be attentive to congressional policy; the exercise of congressional power might well affect the State's prerogatives to afford differential treatment to a particular class of aliens. But we are unable to find in the congressional immigration scheme any statement of policy that might weigh signifi-

---

[21] If the constitutional guarantee of equal protection was available only to those upon whom Congress affirmatively granted its benefit, the State's argument would be virtually unanswerable. But the Equal Protection Clause operates of its own force to protect anyone "within [the State's] jurisdiction" from the State's arbitrary action. See Part II, *supra*. The question we examine in text is whether the federal *disapproval* of the presence of these children assists the State in overcoming the presumption that denial of education to innocent children is not a rational response to legitimate state concerns.

cantly in arriving at an equal protection balance concerning the State's authority to deprive these children of an education.

The Constitution grants Congress the power to "establish an uniform Rule of Naturalization." Art. I., § 8, cl. 4. Drawing upon this power, upon its plenary authority with respect to foreign relations and international commerce, and upon the inherent power of a sovereign to close its borders, Congress has developed a complex scheme governing admission to our Nation and status within our borders. See *Mathews* v. *Diaz*, 426 U. S. 67 (1976); *Harisiades* v. *Shaughnessy*, 342 U. S. 580, 588–589 (1952). The obvious need for delicate policy judgments has counseled the Judicial Branch to avoid intrusion into this field. *Mathews, supra,* at 81. But this traditional caution does not persuade us that unusual deference must be shown the classification embodied in § 21.031. The States enjoy no power with respect to the classification of aliens. See *Hines* v. *Davidowitz*, 312 U. S. 52 (1941). This power is "committed to the political branches of the Federal Government." *Mathews,* 426 U. S., at 81. Although it is "a routine and normally legitimate part" of the business of the Federal Government to classify on the basis of alien status, *id.,* at 85, and to "take into account the character of the relationship between the alien and this country," *id.,* at 80, only rarely are such matters relevant to legislation by a State. See *Id.,* at 84–85; *Nyquist* v. *Mauclet*, 432 U. S. 1, 7, n. 8 (1977).

As we recognized in *De Canas* v. *Bica*, 424 U. S. 351 (1976), the States do have some authority to act with respect to illegal aliens, at least where such action mirrors federal objectives and furthers a legitimate state goal. In *De Canas,* the State's program reflected Congress' intention to bar from employment all aliens except those possessing a grant of permission to work in this country. *Id.,* at 361. In contrast, there is no indication that the disability imposed by § 21.031 corresponds to any identifiable congressional policy. The

State does not claim that the conservation of state educational resources was ever a congressional concern in restricting immigration. More importantly, the classification reflected in § 21.031 does not operate harmoniously within the federal program.

To be sure, like all persons who have entered the United States unlawfully, these children are subject to deportation. 8 U. S. C. §§ 1251, 1252 (1976 ed. and Supp. IV). But there is no assurance that a child subject to deportation will ever be deported. An illegal entrant might be granted federal permission to continue to reside in this country, or even to become a citizen. See, e. g., 8 U. S. C. §§ 1252, 1253(h), 1254 (1976 ed. and Supp. IV). In light of the discretionary federal power to grant relief from deportation, a State cannot realistically determine that any particular undocumented child will in fact be deported until after deportation proceedings have been completed. It would of course be most difficult for the State to justify a denial of education to a child enjoying an inchoate federal permission to remain.

We are reluctant to impute to Congress the intention to withhold from these children, for so long as they are present in this country through no fault of their own, access to a basic education. In other contexts, undocumented status, coupled with some articulable federal policy, might enhance state authority with respect to the treatment of undocumented aliens. But in the area of special constitutional sensitivity presented by these cases, and in the absence of any contrary indication fairly discernible in the present legislative record, we perceive no national policy that supports the State in denying these children an elementary education. The State may borrow the federal classification. But to justify its use as a criterion for its own discriminatory policy, the State must demonstrate that the classification is reasonably adapted to "*the purposes for which the state desires to use it.*" *Oyama* v. *California,* 332 U. S. 633, 664–665 (1948) (Murphy, J., concurring) (emphasis added). We therefore turn to the state objectives that are said to support § 21.031.

## V

Appellants argue that the classification at issue furthers an interest in the "preservation of the state's limited resources for the education of its lawful residents."[22]   Brief for Appellants 26.   Of course, a concern for the preservation of resources standing alone can hardly justify the classification used in allocating those resources.   *Graham* v. *Richardson,* 403 U. S. 365, 374–375 (1971).   The State must do more than justify its classification with a concise expression of an intention to discriminate.   *Examining Board* v. *Flores de Otero,* 426 U. S. 572, 605 (1976).   Apart from the asserted state prerogative to act against undocumented children solely on the basis of their undocumented status—an asserted prerogative that carries only minimal force in the circumstances of these cases—we discern three colorable state interests that might support § 21.031.

---

[22] Appellant School District sought at oral argument to characterize the alienage classification contained in § 21.031 as simply a test of residence. We are unable to uphold § 21.031 on that basis.   Appellants conceded that if, for example, a Virginian or a legally admitted Mexican citizen entered Tyler with his school-age children, intending to remain only six months, those children would be viewed as residents entitled to attend Tyler schools.   Tr. of Oral Arg. 31–32.   It is thus clear that Tyler's residence argument amounts to nothing more than the assertion that illegal entry, without more, prevents a person from becoming a resident for purposes of enrolling his children in the public schools.   A State may not, however, accomplish what would otherwise be prohibited by the Equal Protection Clause, merely by defining a disfavored group as nonresident.   And illegal entry into the country would not, under traditional criteria, bar a person from obtaining domicile within a State.   C. Bouvé, Exclusion and Expulsion of Aliens in the United States 340 (1912).   Appellants have not shown that the families of undocumented children do not comply with the established standards by which the State historically tests residence.   Apart from the alienage limitation, § 21.031(b) requires a school district to provide education only to resident children.   The school districts of the State are as free to apply to undocumented children established criteria for determining residence as they are to apply those criteria to any other child who seeks admission.

First, appellants appear to suggest that the State may seek to protect itself from an influx of illegal immigrants. While a State might have an interest in mitigating the potentially harsh economic effects of sudden shifts in population,[23] § 21.031 hardly offers an effective method of dealing with an urgent demographic or economic problem. There is no evidence in the record suggesting that illegal entrants impose any significant burden on the State's economy. To the contrary, the available evidence suggests that illegal aliens underutilize public services, while contributing their labor to the local economy and tax money to the state fisc. 458 F. Supp., at 578; 501 F. Supp., at 570–571. The dominant incentive for illegal entry into the State of Texas is the availability of employment; few if any illegal immigrants come to this country, or presumably to the State of Texas, in order to avail themselves of a free education.[24] Thus, even making the doubtful assumption that the net impact of illegal aliens on the economy of the State is negative, we think it clear that "[c]harging tuition to undocumented children constitutes a ludicrously ineffectual attempt to stem the tide of illegal immigration," at least when compared with the alternative of

---

[23] Although the State has no direct interest in controlling entry into this country, that interest being one reserved by the Constitution to the Federal Government, unchecked unlawful migration might impair the State's economy generally, or the State's ability to provide some important service. Despite the exclusive federal control of this Nation's borders, we cannot conclude that the States are without any power to deter the influx of persons entering the United States against federal law, and whose numbers might have a discernible impact on traditional state concerns. See *De Canas* v. *Bica*, 424 U. S., at 354–356.

[24] The courts below noted the ineffectiveness of the Texas provision as a means of controlling the influx of illegal entrants into the State. See 628 F. 2d, at 460–461; 458 F. Supp., at 585; 501 F. Supp., at 578 ("The evidence demonstrates that undocumented persons do not immigrate in search for a free public education. Virtually all of the undocumented persons who come into this country seek employment opportunities and not educational benefits. . . . There was overwhelming evidence . . . of the unimportance of public education as a stimulus for immigration") (footnote omitted).

prohibiting the employment of illegal aliens. 458 F. Supp., at 585. See 628 F. 2d, at 461; 501 F. Supp., at 579, and n. 88.

Second, while it is apparent that a State may "not . . . reduce expenditures for education by barring [some arbitrarily chosen class of] children from its schools," *Shapiro* v. *Thompson*, 394 U. S. 618, 633 (1969), appellants suggest that undocumented children are appropriately singled out for exclusion because of the special burdens they impose on the State's ability to provide high-quality public education. But the record in no way supports the claim that exclusion of undocumented children is likely to improve the overall quality of education in the State.[25] As the District Court in No. 80–1934 noted, the State failed to offer any "credible supporting evidence that a proportionately small diminution of the funds spent on each child [which might result from devoting some state funds to the education of the excluded group] will have a grave impact on the quality of education." 501 F. Supp., at 583. And, after reviewing the State's school financing mechanism, the District Court in No. 80–1538 concluded that barring undocumented children from local schools would not necessarily improve the quality of education provided in those schools. 458 F. Supp., at 577. Of course, even if improvement in the quality of education were a likely result of barring some *number* of children from the schools of the State, the State must support its selection of *this* group as the appropriate target for exclusion. In terms of educational cost and need, however, undocumented children are "basically indistinguishable" from legally resident alien children. *Id.*, at 589; 501 F. Supp., at 583, and n. 104.

Finally, appellants suggest that undocumented children are appropriately singled out because their unlawful presence

---

[25] Nor does the record support the claim that the educational resources of the State are so direly limited that some form of "educational *triage*" might be deemed a reasonable (assuming that it were a permissible) response to the State's problems. *Id.*, at 579–581.

within the United States renders them less likely than other children to remain within the boundaries of the State, and to put their education to productive social or political use within the State. Even assuming that such an interest is legitimate, it is an interest that is most difficult to quantify. The State has no assurance that any child, citizen or not, will employ the education provided by the State within the confines of the State's borders. In any event, the record is clear that many of the undocumented children disabled by this classification will remain in this country indefinitely, and that some will become lawful residents or citizens of the United States. It is difficult to understand precisely what the State hopes to achieve by promoting the creation and perpetuation of a subclass of illiterates within our boundaries, surely adding to the problems and costs of unemployment, welfare, and crime. It is thus clear that whatever savings might be achieved by denying these children an education, they are wholly insubstantial in light of the costs involved to these children, the State, and the Nation.

## VI

If the State is to deny a discrete group of innocent children the free public education that it offers to other children residing within its borders, that denial must be justified by a showing that it furthers some substantial state interest. No such showing was made here. Accordingly, the judgment of the Court of Appeals in each of these cases is

*Affirmed.*

JUSTICE MARSHALL, concurring.

While I join the Court opinion, I do so without in any way retreating from my opinion in *San Antonio Independent School District* v. *Rodriguez*, 411 U. S. 1, 70–133 (1973) (dissenting opinion). I continue to believe that an individual's interest in education is fundamental, and that this view is amply supported "by the unique status accorded public education by our society, and by the close relationship between education and some of our most basic constitutional values."

*Id.*, at 111. Furthermore, I believe that the facts of these cases demonstrate the wisdom of rejecting a rigidified approach to equal protection analysis, and of employing an approach that allows for varying levels of scrutiny depending upon "the constitutional and societal importance of the interest adversely affected and the recognized invidiousness of the basis upon which the particular classification is drawn." *Id.*, at 99. See also *Dandridge* v. *Williams*, 397 U. S. 471, 519–521 (1970) (MARSHALL, J., dissenting). It continues to be my view that a class-based denial of public education is utterly incompatible with the Equal Protection Clause of the Fourteenth Amendment.

JUSTICE BLACKMUN, concurring.

I join the opinion and judgment of the Court.

Like JUSTICE POWELL, I believe that the children involved in this litigation "should not be left on the streets uneducated." *Post*, at 238. I write separately, however, because in my view the nature of the interest at stake is crucial to the proper resolution of these cases.

The "fundamental rights" aspect of the Court's equal protection analysis—the now-familiar concept that governmental classifications bearing on certain interests must be closely scrutinized—has been the subject of some controversy. Justice Harlan, for example, warned that "[v]irtually every state statute affects important rights. . . . [T]o extend the 'compelling interest' rule to all cases in which such rights are affected would go far toward making this Court a 'super-legislature.'" *Shapiro* v. *Thompson*, 394 U. S. 618, 661 (1969) (dissenting opinion). Others have noted that strict scrutiny under the Equal Protection Clause is unnecessary when classifications infringing enumerated constitutional rights are involved, for "a state law that impinges upon a substantive right or liberty created or conferred by the Constitution is, of course, presumptively invalid, whether or not the law's purpose or effect is to create any classifications." *San Antonio*

*Independent School Dist.* v. *Rodriguez,* 411 U. S. 1, 61 (1973) (Stewart, J., concurring). See *Shapiro* v. *Thompson,* 394 U. S., at 659 (Harlan, J., dissenting). Still others have suggested that fundamental rights are not properly a part of equal protection analysis at all, because they are unrelated to any defined principle of equality.[1]

These considerations, combined with doubts about the judiciary's ability to make fine distinctions in assessing the effects of complex social policies, led the Court in *Rodriguez* to articulate a firm rule: fundamental rights are those that "explicitly or implicitly [are] guaranteed by the Constitution." 411 U. S., at 33–34. It therefore squarely rejected the notion that "an ad hoc determination as to the social or economic importance" of a given interest is relevant to the level of scrutiny accorded classifications involving that interest, *id.,* at 32, and made clear that "[i]t is not the province of this Court to create substantive constitutional rights in the name of guaranteeing equal protection of the laws." *Id.,* at 33.

I joined JUSTICE POWELL's opinion for the Court in *Rodriguez,* and I continue to believe that it provides the appropriate model for resolving most equal protection disputes. Classifications infringing substantive constitutional rights necessarily will be invalid, if not by force of the Equal Protection Clause, then through operation of other provisions of the Constitution. Conversely, classifications bearing on nonconstitutional interests—even those involving "the most basic economic needs of impoverished human beings," *Dandridge* v. *Williams,* 397 U. S. 471, 485 (1970)—generally are not subject to special treatment under the Equal Protection Clause, because they are not distinguishable in any relevant way from other regulations in "the area of economics and social welfare." *Ibid.*

With all this said, however, I believe the Court's experience has demonstrated that the *Rodriguez* formulation does

---

[1] See, *e. g.,* Perry, Modern Equal Protection: A Conceptualization and Appraisal, 79 Colum. L. Rev. 1023, 1075–1083 (1979).

not settle every issue of "fundamental rights" arising under the Equal Protection Clause. Only a pedant would insist that there are *no* meaningful distinctions among the multitude of social and political interests regulated by the States, and *Rodriguez* does not stand for quite so absolute a proposition. To the contrary, *Rodriguez* implicitly acknowledged that certain interests, though not constitutionally guaranteed, must be accorded a special place in equal protection analysis. Thus, the Court's decisions long have accorded strict scrutiny to classifications bearing on the right to vote in state elections, and *Rodriguez* confirmed the "constitutional underpinnings of the right to equal treatment in the voting process." 411 U. S., at 34, n. 74. Yet "the right to vote, *per se,* is not a constitutionally protected right," *id.,* at 35, n. 78. See *Harper* v. *Virginia Board of Elections,* 383 U. S. 663, 665 (1966); *Rodriguez,* 411 U. S., at 59, n. 2 (Stewart, J., concurring). Instead, regulation of the electoral process receives unusual scrutiny because "the right to exercise the franchise in a free and unimpaired manner is preservative of other basic civil and political rights." *Reynolds* v. *Sims,* 377 U. S. 533, 562 (1964). See *Dunn* v. *Blumstein,* 405 U. S. 330, 336 (1972). In other words, the right to vote is accorded extraordinary treatment because it is, in equal protection terms, an extraordinary right: a citizen[2] cannot hope to achieve any meaningful degree of individual political equality if granted an inferior right of participation in the political process. Those denied the vote are relegated, by state fiat, in a most basic way to second-class status.

It is arguable, of course, that the Court never should have applied fundamental rights doctrine in the fashion outlined above. Justice Harlan, for one, maintained that strict equal protection scrutiny was appropriate only when racial or anal-

---

[2] I use the term "citizen" advisedly. The right to vote, of course, is a political interest of concern to citizens. The right to an education, in contrast, is a social benefit of relevance to a substantial number of those affected by Texas' statutory scheme, as is discussed below.

ogous classifications were at issue. *Shapiro* v. *Thompson*, 394 U. S., at 658–663 (dissenting opinion). See *Reynolds* v. *Sims*, 377 U. S., at 590–591 (Harlan, J., dissenting). But it is too late to debate that point, and I believe that accepting the principle of the voting cases—the idea that state classifications bearing on certain interests pose the risk of allocating rights in a fashion inherently contrary to any notion of "equality"—dictates the outcome here. As both JUSTICE POWELL and THE CHIEF JUSTICE observe, the Texas scheme inevitably will create "a subclass of illiterate persons," *post*, at 241 (POWELL, J., concurring); see *post*, at 242, 254 (BURGER, C. J., dissenting); where I differ with THE CHIEF JUSTICE is in my conclusion that this makes the statutory scheme unconstitutional as well as unwise.

In my view, when the State provides an education to some and denies it to others, it immediately and inevitably creates class distinctions of a type fundamentally inconsistent with those purposes, mentioned above, of the Equal Protection Clause. Children denied an education are placed at a permanent and insurmountable competitive disadvantage, for an uneducated child is denied even the opportunity to achieve. And when those children are members of an identifiable group, that group—through the State's action—will have been converted into a discrete underclass. Other benefits provided by the State, such as housing and public assistance, are of course important; to an individual in immediate need, they may be more desirable than the right to be educated. But classifications involving the complete denial of education are in a sense unique, for they strike at the heart of equal protection values by involving the State in the creation of permanent class distinctions. Cf. *Rodriguez*, 411 U. S., at 115, n. 74 (MARSHALL, J., dissenting). In a sense, then, denial of an education is the analogue of denial of the right to vote: the former relegates the individual to second-class social status; the latter places him at a permanent political disadvantage.

This conclusion is fully consistent with *Rodriguez*. The Court there reserved judgment on the constitutionality of a state system that "occasioned an absolute denial of educational opportunities to any of its children," noting that "no charge fairly could be made that the system [at issue in *Rodriguez*] fails to provide each child with an opportunity to acquire . . . basic minimal skills." *Id.*, at 37. And it cautioned that in a case "involv[ing] the most persistent and difficult questions of educational policy, . . . [the] Court's lack of specialized knowledge and experience counsels against premature interference with the informed judgments made at the state and local levels." *Id.*, at 42. Thus *Rodriguez* held, and the Court now reaffirms, that "a State need not justify by compelling necessity every variation in the manner in which education is provided to its population." *Ante*, at 223. Similarly, it is undeniable that education is not a "fundamental right" in the sense that it is constitutionally guaranteed. Here, however, the State has undertaken to provide an education to most of the children residing within its borders. And, in contrast to the situation in *Rodriguez*, it does not take an advanced degree to predict the effects of a complete denial of education upon those children targeted by the State's classification. In such circumstances, the voting decisions suggest that the State must offer something more than a rational basis for its classification.[3]

Concededly, it would seem ironic to discuss the social necessity of an education in a case that concerned only undocumented aliens "whose very presence in the state and this country is illegal." *Post*, at 250 (BURGER, C. J., dissenting). But because of the nature of the federal immigration laws and the pre-eminent role of the Federal Government in

---

[3] The Court concludes that the provision at issue must be invalidated "unless it furthers some substantial goal of the State." *Ante*, at 224. Since the statute fails to survive this level of scrutiny, as the Court demonstrates, there is no need to determine whether a more probing level of review would be appropriate.

regulating immigration, the class of children here is not a monolithic one. Thus, the District Court in the *Alien Children Education* case found as a factual matter that a significant number of illegal aliens will remain in this country permanently, 501 F. Supp. 544, 558–559 (SD Tex. 1980); that some of the children involved in this litigation are "documentable," *id.*, at 573; and that "[m]any of the undocumented children are not deportable. None of the named plaintiffs is under an order of deportation." *Id.*, at 583, n. 103. As the Court's alienage cases demonstrate, these children may not be denied rights that are granted to citizens, excepting only those rights bearing on political interests. See *Nyquist* v. *Mauclet*, 432 U. S. 1 (1977). And, as JUSTICE POWELL notes, the structure of the immigration statutes makes it impossible for the State to determine which aliens are entitled to residence, and which eventually will be deported. *Post*, at 240–241, n. 6. Indeed, any attempt to do so would involve the State in the administration of the immigration laws. Whatever the State's power to classify deportable aliens, then—and whatever the Federal Government's ability to draw more precise and more acceptable alienage classifications—the statute at issue here sweeps within it a substantial number of children who will in fact, and who may well be entitled to, remain in the United States. Given the extraordinary nature of the interest involved, this makes the classification here fatally imprecise. And, as the Court demonstrates, the Texas legislation is not otherwise supported by any substantial interests.

Because I believe that the Court's carefully worded analysis recognizes the importance of the equal protection and preemption interests I consider crucial, I join its opinion as well as its judgment.

JUSTICE POWELL, concurring.

I join the opinion of the Court, and write separately to emphasize the unique character of the cases before us.

The classification in question severely disadvantages children who are the victims of a combination of circumstances. Access from Mexico into this country, across our 2,000-mile border, is readily available and virtually uncontrollable. Illegal aliens are attracted by our employment opportunities, and perhaps by other benefits as well. This is a problem of serious national proportions, as the Attorney General recently has recognized. See *ante*, at 218–219, n. 17. Perhaps because of the intractability of the problem, Congress—vested by the Constitution with the responsibility of protecting our borders and legislating with respect to aliens—has not provided effective leadership in dealing with this problem.[1] It therefore is certain that illegal aliens will continue

---

[1] Article I, § 8, cl. 4, of the Constitution provides: "The Congress shall have Power . . . To establish an uniform Rule of Naturalization." The Federal Government has "broad constitutional powers in determining what aliens shall be admitted to the United States, the period they may remain, regulation of their conduct before naturalization, and the terms and conditions of their naturalization." *Takahashi* v. *Fish & Game Comm'n*, 334 U. S. 410, 419 (1948). See *Graham* v. *Richardson*, 403 U. S. 365, 378 (1971) (regulation of aliens is "constitutionally entrusted to the Federal Government"). The Court has traditionally shown great deference to federal authority over immigration and to federal classifications based upon alienage. See, *e. g.*, *Fiallo* v. *Bell*, 430 U. S. 787, 792 (1977) ("it is important to underscore the limited scope of judicial inquiry into immigration legislation"); *Harisiades* v. *Shaughnessy*, 342 U. S. 580, 588–589 (1952) ("It is pertinent to observe that any policy toward aliens is vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations, the war power, and the maintenance of a republican form of government. Such matters are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference"). Indeed, even equal protection analysis in this area is based to a large extent on an underlying theme of pre-emption and exclusive federal power over immigration. See *Takahashi* v. *Fish & Game Comm'n*, *supra*, at 420 (the Federal Government has admitted resident aliens to the country "on an equality of legal privileges with all citizens under nondiscriminatory laws" and the States may not alter the terms of this admission). Compare *Graham* v. *Richardson*, *supra*, and *Sugarman* v. *Dougall*, 413 U. S. 634 (1973), with *Mathews* v. *Diaz*, 426 U. S. 67 (1976),

to enter the United States and, as the record makes clear, an unknown percentage of them will remain here. I agree with the Court that their children should not be left on the streets uneducated.

Although the analogy is not perfect, our holding today does find support in decisions of this Court with respect to the status of illegitimates. In *Weber* v. *Aetna Casualty & Surety Co.*, 406 U. S. 164, 175 (1972), we said: "[V]isiting . . . condemnation on the head of an infant" for the misdeeds of the parents is illogical, unjust, and "contrary to the basic concept of our system that legal burdens should bear some relationship to individual responsibility or wrongdoing."

In these cases, the State of Texas effectively denies to the school-age children of illegal aliens the opportunity to attend the free public schools that the State makes available to all residents. They are excluded only because of a status resulting from the violation by parents or guardians of our immigration laws and the fact that they remain in our country unlawfully. The appellee children are innocent in this respect. They can "affect neither their parents' conduct nor their own status." *Trimble* v. *Gordon*, 430 U. S. 762, 770 (1977).

Our review in a case such as these is properly heightened.[2] See *id.*, at 767. Cf. *Craig* v. *Boren*, 429 U. S. 190 (1976). The classification at issue deprives a group of children of the opportunity for education afforded all other children simply because they have been assigned a legal status due to a violation of law by their parents. These children thus have been

---

and *Hampton* v. *Mow Sun Wong*, 426 U. S. 88 (1976). Given that the States' power to regulate in this area is so limited, and that this is an area of such peculiarly strong federal authority, the necessity of federal leadership seems evident.

[2] I emphasize the Court's conclusion that strict scrutiny is not appropriately applied to this classification. This exacting standard of review has been reserved for instances in which a "fundamental" constitutional right or a "suspect" classification is present. Neither is present in these cases, as the Court holds.

singled out for a lifelong penalty and stigma.   A legislative
classification that threatens the creation of an underclass
of future citizens and residents cannot be reconciled with
one of the fundamental purposes of the Fourteenth Amend-
ment.   In these unique circumstances, the Court properly
may require that the State's interests be substantial and that
the means bear a "fair and substantial relation" to these in-
terests.[3]   See *Lalli* v. *Lalli*, 439 U. S. 259, 265 (1978) ("clas-
sifications based on illegitimacy . . . are invalid under the
Fourteenth Amendment if they are not substantially re-
lated to permissible state interests"); *id.*, at 271 ("[a]s the
State's interests are substantial, we now consider the means
adopted").

In my view, the State's denial of education to these chil-
dren bears no substantial relation to any substantial state
interest.   Both of the District Courts found that an uncertain
but significant percentage of illegal alien children will remain
in Texas as residents and many eventually will become
citizens.   The discussion by the Court, *ante*, at Part V, of
the State's purported interests demonstrates that they are
poorly served by the educational exclusion.   Indeed, the in-
terests relied upon by the State would seem to be insubstan-
tial in view of the consequences to the State itself of wholly
uneducated persons living indefinitely within its borders.
By contrast, access to the public schools is made available to
the children of lawful residents without regard to the tempo-

---

[3] THE CHIEF JUSTICE argues in his dissenting opinion that this height-
ened standard of review is inconsistent with the Court's decision in *San
Antonio Independent School District* v. *Rodriguez*, 411 U. S. 1 (1973).
But in *Rodriguez* no group of children was singled out by the State and
then penalized because of their parents' status.   Rather, funding for edu-
cation varied across the State because of the tradition of local control.
Nor, in that case, was any group of children totally deprived of all educa-
tion as in these cases.   If the resident children of illegal aliens were denied
welfare assistance, made available by government to all other children who
qualify, this also—in my opinion—would be an impermissible penalizing of
children because of their parents' status.

rary nature of their residency in the particular Texas school district.[4] The Court of Appeals and the District Courts that addressed these cases concluded that the classification could not satisfy even the bare requirements of rationality. One need not go so far to conclude that the exclusion of appellees' class[5] of children from state-provided education is a type of punitive discrimination based on status that is impermissible under the Equal Protection Clause.

In reaching this conclusion, I am not unmindful of what must be the exasperation of responsible citizens and government authorities in Texas and other States similarly situated. Their responsibility, if any, for the influx of aliens is slight compared to that imposed by the Constitution on the Federal Government.[6] So long as the ease of entry remains inviting,

---

[4] The State provides free public education to all lawful residents whether they intend to reside permanently in the State or only reside in the State temporarily. See *ante*, at 227, n. 22. Of course a school district may require that illegal alien children, like any other children, actually reside in the school district before admitting them to the schools. A requirement of *de facto* residency, uniformly applied, would not violate any principle of equal protection.

[5] The classes certified in these cases included all undocumented school-age children of Mexican origin residing in the school district, see *ante*, at 206, or the State. See *In re Alien Children Education Litigation*, 501 F. Supp. 544, 553 (SD Tex. 1980). Even so, it is clear that neither class was thought to include mature Mexican minors who were solely responsible for violating the immigration laws. In 458 F. Supp. 569 (ED Tex. 1978), the court characterized plaintiffs as "entire families who have migrated illegally." *Id.*, at 578. Each of the plaintiff children in that case was represented by a parent or guardian. Similarly the court in *In re Alien Children Education Litigation* found that "[u]ndocumented children do not enter the United States unaccompanied by their parents." 501 F. Supp., at 573. A different case would be presented in the unlikely event that a minor, old enough to be responsible for illegal entry and yet still of school age, entered this country illegally on his own volition.

[6] In addition, the States' ability to respond on their own to the problems caused by this migration may be limited by the principles of pre-emption that apply in this area. See, *e. g., Hines* v. *Davidowitz*, 312 U. S. 52

and the power to deport is exercised infrequently by the Federal Government, the additional expense of admitting these children to public schools might fairly be shared by the Federal and State Governments. But it hardly can be argued rationally that anyone benefits from the creation within our borders of a subclass of illiterate persons many of whom will remain in the State, adding to the problems and costs of both State and National Governments attendant upon unemployment, welfare, and crime.

---

(1941). In *De Canas* v. *Bica*, 424 U. S. 351 (1976), the Court found that a state law making it a criminal offense to employ illegal aliens was not preempted by federal authority over aliens and immigration. The Court found evidence that Congress intended state regulation in this area. *Id.*, at 361 ("there is evidence . . . that Congress intends that States may, to the extent consistent with federal law, regulate the employment of illegal aliens"). Moreover, under federal immigration law, only immigrant aliens and nonimmigrant aliens with special permission are entitled to work. See 1 C. Gordon & H. Rosenfield, Immigration Law and Procedure, §§ 1.34a, 1.36, 2.6b (1981). Because federal law clearly indicates that only certain specified aliens may lawfully work in the country and because these aliens have documentation establishing this right, the State in *De Canas* was able to identify with certainty which aliens had a federal permission to work in this country. The State did not need to concern itself with an alien's current or future deportability. By contrast, there is no comparable federal guidance in the area of education. No federal law invites state regulation; no federal regulations identify those aliens who have a right to attend public schools. In addition, the Texas educational exclusion requires the State to make predictions as to whether individual aliens eventually will be found to be deportable. But it is impossible for a State to determine which aliens the Federal Government will eventually deport, which the Federal Government will permit to stay, and which the Federal Government will ultimately naturalize. Until an undocumented alien is ordered deported by the Federal Government, no State can be assured that the alien will not be found to have a federal permission to reside in the country, perhaps even as a citizen. Indeed, even the Immigration and Naturalization Service cannot predict with certainty whether any individual alien has a right to reside in the country until deportation proceedings have run their course. See, *e. g.*, 8 U. S. C. §§ 1252, 1253(h), 1254 (1976 ed. and Supp. IV).

CHIEF JUSTICE BURGER, with whom JUSTICE WHITE, JUSTICE REHNQUIST, and JUSTICE O'CONNOR join, dissenting.

Were it our business to set the Nation's social policy, I would agree without hesitation that it is senseless for an enlightened society to deprive any children—including illegal aliens—of an elementary education. I fully agree that it would be folly—and wrong—to tolerate creation of a segment of society made up of illiterate persons, many having a limited or no command of our language.[1] However, the Constitution does not constitute us as "Platonic Guardians" nor does it vest in this Court the authority to strike down laws because they do not meet our standards of desirable social policy, "wisdom," or "common sense." See *TVA* v. *Hill*, 437 U. S. 153, 194–195 (1978). We trespass on the assigned function of the political branches under our structure of limited and separated powers when we assume a policymaking role as the Court does today.

The Court makes no attempt to disguise that it is acting to make up for Congress' lack of "effective leadership" in dealing with the serious national problems caused by the influx of uncountable millions of illegal aliens across our borders.[2]

---

[1] It does not follow, however, that a state should bear the costs of educating children whose illegal presence in this country results from the default of the political branches of the Federal Government. A state has no power to prevent unlawful immigration, and no power to deport illegal aliens; those powers are reserved exclusively to Congress and the Executive. If the Federal Government, properly chargeable with deporting illegal aliens, fails to do so, it should bear the burdens of their presence here. Surely if illegal alien children can be identified for purposes of this litigation, their parents can be identified for purposes of prompt deportation.

[2] The Department of Justice recently estimated the number of illegal aliens within the United States at between 3 and 6 million. Joint Hearing before the Subcommittee on Immigration, Refugees, and International Law of the House Committee on the Judiciary and the Subcommittee on Immigration and Refugee Policy of the Senate Committee on the Judiciary, 97th Cong., 1st Sess., 7 (1981) (testimony of Attorney General Smith). Other estimates run as high as 12 million. See Strout, Closing the Door on Immigration, Christian Science Monitor, May 21, 1982, p. 22, col. 4.

See *ante*, at 237–238 (POWELL, J., concurring). The failure of enforcement of the immigration laws over more than a decade and the inherent difficulty and expense of sealing our vast borders have combined to create a grave socioeconomic dilemma. It is a dilemma that has not yet even been fully assessed, let alone addressed. However, it is not the function of the Judiciary to provide "effective leadership" simply because the political branches of government fail to do so.

The Court's holding today manifests the justly criticized judicial tendency to attempt speedy and wholesale formulation of "remedies" for the failures—or simply the laggard pace—of the political processes of our system of government. The Court employs, and in my view abuses, the Fourteenth Amendment in an effort to become an omnipotent and omniscient problem solver. That the motives for doing so are noble and compassionate does not alter the fact that the Court distorts our constitutional function to make amends for the defaults of others.

I

In a sense, the Court's opinion rests on such a unique confluence of theories and rationales that it will likely stand for little beyond the results in these particular cases. Yet the extent to which the Court departs from principled constitutional adjudication is nonetheless disturbing.

I have no quarrel with the conclusion that the Equal Protection Clause of the Fourteenth Amendment *applies* to aliens who, after their illegal entry into this country, are indeed physically "within the jurisdiction" of a state. However, as the Court concedes, this "only begins the inquiry." *Ante*, at 215. The Equal Protection Clause does not mandate identical treatment of different categories of persons. *Jefferson* v. *Hackney*, 406 U. S. 535, 549 (1972); *Reed* v. *Reed*, 404 U. S. 71, 75 (1971); *Tigner* v. *Texas*, 310 U. S. 141, 147–148 (1940).

The dispositive issue in these cases, simply put, is whether, for purposes of allocating its finite resources, a state has a legitimate reason to differentiate between persons

who are lawfully within the state and those who are unlawfully there. The distinction the State of Texas has drawn—based not only upon its own legitimate interests but on classifications established by the Federal Government in its immigration laws and policies—is not unconstitutional.

## A

The Court acknowledges that, except in those cases when state classifications disadvantage a "suspect class" or impinge upon a "fundamental right," the Equal Protection Clause permits a state "substantial latitude" in distinguishing between different groups of persons. *Ante*, at 216–217. Moreover, the Court expressly—and correctly—rejects any suggestion that illegal aliens are a suspect class, *ante*, at 219, n. 19, or that education is a fundamental right, *ante*, at 221, 223. Yet by patching together bits and pieces of what might be termed quasi-suspect-class and quasi-fundamental-rights analysis, the Court spins out a theory custom-tailored to the facts of these cases.

In the end, we are told little more than that the level of scrutiny employed to strike down the Texas law applies only when illegal alien children are deprived of a public education, see *ante*, at 223–224.[3] If ever a court was guilty of an unabashedly result-oriented approach, this case is a prime example.

## (1)

The Court first suggests that these illegal alien children, although not a suspect class, are entitled to special solicitude under the Equal Protection Clause because they lack "control" over or "responsibility" for their unlawful entry into this country. *Ante*, at 220, 223–224. Similarly, the Court appears to take the position that § 21.031 is presumptively "irrational" because it has the effect of imposing "penalties"

---

[3] The Court implies, for example, that the Fourteenth Amendment would not require a state to provide welfare benefits to illegal aliens.

on "innocent" children. *Ibid.* See also *ante*, at 238–239 (POWELL, J., concurring).[4] However, the Equal Protection Clause does not preclude legislators from classifying among persons on the basis of factors and characteristics over which individuals may be said to lack "control." Indeed, in some circumstances persons generally, and children in particular, may have little control over or responsibility for such things as their ill health, need for public assistance, or place of residence. Yet a state legislature is not barred from considering, for example, relevant differences between the mentally healthy and the mentally ill, or between the residents of different counties,[5] simply because these may be factors unrelated to individual choice or to any "wrongdoing." The Equal Protection Clause protects against arbitrary and irrational classifications, and against invidious discrimination stemming from prejudice and hostility; it is not an all-encompassing "equalizer" designed to eradicate every distinction for which persons are not "responsible."

---

[4] Both the opinion of the Court and JUSTICE POWELL's concurrence imply that appellees are being "penalized" because their *parents* are illegal entrants. *Ante*, at 220; *ante*, at 238–239, and 239, n. 3 (POWELL, J., concurring). However, Texas has classified appellees on the basis of *their own* illegal status, not that of their parents. Children born in this country to illegal alien parents, including some of appellees' siblings, are not excluded from the Texas schools. Nor does Texas discriminate against appellees because of their Mexican origin or citizenship. Texas provides a free public education to countless thousands of Mexican immigrants who are lawfully in this country.

[5] Appellees "lack control" over their illegal residence in this country in the same sense as lawfully resident children lack control over the school district in which their parents reside. Yet in *San Antonio Independent School Dist. v. Rodriguez*, 411 U. S. 1 (1973), we declined to review under "heightened scrutiny" a claim that a State discriminated against residents of less wealthy school districts in its provision of educational benefits. There was no suggestion in that case that a child's "lack of responsibility" for his residence in a particular school district had any relevance to the proper standard of review of his claims. The result was that children lawfully here but residing in different counties received different treatment.

The Court does not presume to suggest that appellees' purported lack of culpability for their illegal status prevents them from being deported or otherwise "penalized" under federal law. Yet would deportation be any less a "penalty" than denial of privileges provided to legal residents?[6] Illegality of presence in the United States does not—and need not—depend on some amorphous concept of "guilt" or "innocence" concerning an alien's entry. Similarly, a state's use of federal immigration status as a basis for legislative classification is not necessarily rendered suspect for its failure to take such factors into account.

The Court's analogy to cases involving discrimination against illegitimate children—see *ante*, at 220; *ante*, at 238–239 (POWELL, J., concurring)—is grossly misleading. The State has not thrust any disabilities upon appellees due to their "status of birth." Cf. *Weber* v. *Aetna Casualty & Surety Co.*, 406 U. S. 164, 176 (1972). Rather, appellees' status is predicated upon the circumstances of their concededly illegal presence in this country, and is a direct result of Congress' obviously valid exercise of its "broad constitutional powers" in the field of immigration and naturalization. U. S. Const., Art. I, § 8, cl. 4; see *Takahashi* v. *Fish & Game Comm'n*, 334 U. S. 410, 419 (1948). This Court has recognized that in allocating governmental benefits to a given class of aliens, one "may take into account the character of the relationship between the alien and this country." *Mathews* v. *Diaz*, 426 U. S. 67, 80 (1976). When that "relationship" is a federally prohibited one, there can, of course, be no presumption that a state has a constitutional duty to include illegal aliens among the recipients of its governmental benefits.[7]

---

[6] Indeed, even children of illegal alien parents born in the United States can be said to be "penalized" when their parents are deported.

[7] It is true that the Constitution imposes lesser constraints on the Federal Government than on the states with regard to discrimination against *lawfully* admitted aliens. *E. g.*, *Mathews* v. *Diaz*, 426 U. S. 67 (1976); *Hampton* v. *Mow Sun Wong*, 426 U. S. 88 (1976). This is because "Congress and the President have broad power over immigration and natural-

## (2)

The second strand of the Court's analysis rests on the premise that, although public education is not a constitutionally guaranteed right, "neither is it merely some governmental 'benefit' indistinguishable from other forms of social welfare legislation." *Ante,* at 221. Whatever meaning or relevance this opaque observation might have in some other context,[8] it simply has no bearing on the issues at hand. Indeed, it is never made clear what the Court's opinion means on this score.

The importance of education is beyond dispute. Yet we have held repeatedly that the importance of a governmental service does not elevate it to the status of a "fundamental right" for purposes of equal protection analysis. *San Antonio Independent School Dist.* v. *Rodriguez,* 411 U. S. 1, 30–31 (1973); *Lindsey* v. *Normet,* 405 U. S. 56, 73–74 (1972). In *San Antonio Independent School Dist., supra,* JUSTICE POWELL, speaking for the Court, expressly rejected the proposition that state laws dealing with public education are subject to special scrutiny under the Equal Protection Clause. Moreover, the Court points to no meaningful way to distinguish between education and other governmental bene-

---

ization which the States do not possess," *Hampton, supra,* at 95, and because state discrimination against legally resident aliens conflicts with and alters "the conditions lawfully imposed by Congress upon admission, naturalization and residence of aliens in the United States or the several states." *Takahashi* v. *Fish & Game Comm'n,* 334 U. S. 410, 419 (1948). However, the same cannot be said when Congress has decreed that certain aliens should not be admitted to the United States at all.

[8] In support of this conclusion, the Court's opinion strings together quotations drawn from cases addressing such diverse matters as the right of individuals under the Due Process Clause to learn a foreign language, *Meyer* v. *Nebraska,* 262 U. S. 390 (1923); the First Amendment prohibition against state-mandated religious exercises in the public schools, *Abington School District* v. *Schempp,* 374 U. S. 203 (1963); and state impingements upon the free exercise of religion, *Wisconsin* v. *Yoder,* 406 U. S. 205 (1972). However, not every isolated utterance of this Court retains force when wrested from the context in which it was made.

fits in this context. Is the Court suggesting that education is more "fundamental" than food, shelter, or medical care?

The Equal Protection Clause guarantees similar treatment of similarly situated persons, but it does not mandate a constitutional hierarchy of governmental services. JUSTICE POWELL, speaking for the Court in *San Antonio Independent School Dist.*, *supra*, at 31, put it well in stating that to the extent this Court raises or lowers the degree of "judicial scrutiny" in equal protection cases according to a transient Court majority's view of the societal importance of the interest affected, we "assum[e] a legislative role and one for which the Court lacks both authority and competence." Yet that is precisely what the Court does today. See also *Shapiro* v. *Thompson*, 394 U. S. 618, 655–661 (1969) (Harlan, J., dissenting).

The central question in these cases, as in every equal protection case not involving truly fundamental rights "explicitly or implicitly guaranteed by the Constitution," *San Antonio Independent School Dist.*, *supra*, at 33–34, is whether there is some legitimate basis for a legislative distinction between different classes of persons. The fact that the distinction is drawn in legislation affecting access to public education—as opposed to legislation allocating other important governmental benefits, such as public assistance, health care, or housing—cannot make a difference in the level of scrutiny applied.

B

Once it is conceded—as the Court does—that illegal aliens are not a suspect class, and that education is not a fundamental right, our inquiry should focus on and be limited to whether the legislative classification at issue bears a rational relationship to a legitimate state purpose. *Vance* v. *Bradley*, 440 U. S. 93, 97 (1979); *Dandridge* v. *Williams*, 397 U. S. 471, 485–487 (1970); see *ante*, at 216.[9]

---

[9] This "rational basis standard" was applied by the Court of Appeals. 628 F. 2d 448, 458–461 (1980).

The State contends primarily that § 21.031 serves to prevent undue depletion of its limited revenues available for education, and to preserve the fiscal integrity of the State's school-financing system against an ever-increasing flood of illegal aliens—aliens over whose entry or continued presence it has no control. Of course such fiscal concerns alone could not justify discrimination against a suspect class or an arbitrary and irrational denial of benefits to a particular group of persons. Yet I assume no Member of this Court would argue that prudent conservation of finite state revenues is *per se* an illegitimate goal. Indeed, the numerous classifications this Court has sustained in social welfare legislation were invariably related to the limited amount of revenues available to spend on any given program or set of programs. See, *e. g., Jefferson* v. *Hackney*, 406 U. S., at 549–551; *Dandridge* v. *Williams, supra*, at 487. The significant question here is whether the requirement of tuition from illegal aliens who attend the public schools—as well as from residents of other states, for example—is a rational and reasonable means of furthering the State's legitimate fiscal ends.[10]

---

[10] The Texas law might also be justified as a means of deterring unlawful immigration. While regulation of immigration is an exclusively federal function, a state may take steps, consistent with federal immigration policy, to protect its economy and ability to provide governmental services from the "deleterious effects" of a massive influx of illegal immigrants. *De Canas* v. *Bica*, 424 U. S. 351 (1976); *ante*, at 228, n. 23. The Court maintains that denying illegal aliens a free public education is an "ineffectual" means of deterring unlawful immigration, at least when compared to a prohibition against the employment of illegal aliens. *Ante*, at 228–229. Perhaps that is correct, but it is not dispositive; the Equal Protection Clause does not mandate that a state choose either the most effective and all-encompassing means of addressing a problem or none at all. *Dandridge* v. *Williams*, 397 U. S. 471, 486–487 (1970). Texas might rationally conclude that more significant "demographic or economic problem[s]," *ante*, at 228, are engendered by the illegal entry into the State of entire families of aliens for indefinite periods than by the periodic sojourns of single adults who intend to leave the State after short-term or seasonal employment. It blinks reality to maintain that the availability of governmental services such as education plays no role in an alien family's decision to enter, or re-

Without laboring what will undoubtedly seem obvious to many, it simply is not "irrational" for a state to conclude that it does not have the same responsibility to provide benefits for persons whose very presence in the state and this country is illegal as it does to provide for persons lawfully present. By definition, illegal aliens have no right whatever to be here, and the state may reasonably, and constitutionally, elect not to provide them with governmental services at the expense of those who are lawfully in the state.[11] In *De Canas* v. *Bica*, 424 U. S. 351, 357 (1976), we held that a State may protect its "fiscal interests and lawfully resident labor force from the deleterious effects on its economy resulting from the employment of illegal aliens." And only recently this Court made clear that a State has a legitimate interest in protecting and preserving the quality of its schools and "the right of its own *bona fide residents* to attend such institutions on a preferential tuition basis." *Vlandis* v. *Kline*, 412 U. S. 441, 453 (1973) (emphasis added). See also *Elkins* v. *Moreno*, 435 U. S. 647, 663–668 (1978). The Court has failed to offer even a plausible explanation why illegality of residence

---

main in, this country; certainly, the availability of a free bilingual public education might well influence an alien to bring his children rather than travel alone for better job opportunities.

[11] The Court suggests that the State's classification is improper because "[a]n illegal entrant might be granted federal permission to continue to reside in this country, or even to become a citizen." *Ante*, at 226. However, once an illegal alien is given federal permission to remain, he is no longer subject to exclusion from the tuition-free public schools under § 21.031. The Court acknowledges that the Tyler Independent School District provides a free public education to any alien who has obtained, *or is in the process of obtaining*, documentation from the United States Immigration and Naturalization Service. See *ante*, at 206, n. 2. Thus, Texas has not taken it upon itself to determine which aliens are or are not entitled to United States residence. JUSTICE BLACKMUN's assertion that the Texas statute will be applied to aliens "who may well be entitled to . . . remain in the United States," *ante*, at 236 (concurring opinion), is wholly without foundation.

in this country is not a factor that may legitimately bear upon the bona fides of state residence and entitlement to the benefits of lawful residence.[12]

It is significant that the Federal Government has seen fit to exclude illegal aliens from numerous social welfare programs, such as the food stamp program, 7 U. S. C. § 2015(f) (1976 ed. and Supp. IV) and 7 CFR § 273.4 (1981), the old-age assistance, aid to families with dependent children, aid to the blind, aid to the permanently and totally disabled, and supplemental security income programs, 45 CFR § 233.50 (1981), the Medicare hospital insurance benefits program, 42 U. S. C. § 1395i–2 and 42 CFR § 405.205(b) (1981), and the Medicaid hospital insurance benefits for the aged and disabled program, 42 U. S. C. § 1395o and 42 CFR § 405.103 (a)(4) (1981). Although these exclusions do not conclusively demonstrate the constitutionality of the State's use of the same classification for comparable purposes, at the very least they tend to support the rationality of excluding illegal alien residents of a state from such programs so as to preserve the state's. finite revenues for the benefit of lawful residents. See *Mathews* v. *Diaz*, 426 U. S, at 80; see also n. 7, *supra*.

The Court maintains—as if this were the issue—that "barring undocumented children from local schools would not necessarily improve the quality of education provided in those

---

[12] The Court's opinion is disingenuous when it suggests that the State has merely picked a "disfavored group" and arbitrarily defined its members as nonresidents. *Ante*, at 227, n. 22. Appellees' "disfavored status" stems from the very fact that federal law explicitly prohibits them from being in this country. Moreover, the analogies to Virginians or legally admitted Mexican citizens entering Texas, *ibid.*, are spurious. A Virginian's right to migrate to Texas, without penalty, is protected by the Constitution, see, *e. g.*, *Shapiro* v. *Thompson*, 394 U. S. 618 (1969); and a lawfully admitted alien's right to enter the State is likewise protected by federal law. See *Takahashi* v. *Fish & Game Comm'n*, 334 U. S. 410 (1948). Cf. *Zobel* v. *Williams*, *ante*, p. 55.

schools." *Ante*, at 229. See 458 F. Supp. 569, 577 (ED Tex. 1978).[13] However, the legitimacy of barring illegal aliens from programs such as Medicare or Medicaid does not depend on a showing that the barrier would "improve the quality" of medical care given to persons lawfully entitled to participate in such programs. Modern education, like medical care, is enormously expensive, and there can be no doubt that very large added costs will fall on the State or its local school districts as a result of the inclusion of illegal aliens in the tuition-free public schools. The State may, in its discretion, use any savings resulting from its tuition requirement to "improve the quality of education" in the public school system, or to enhance the funds available for other social programs, or to reduce the tax burden placed on its residents; each of these ends is "legitimate." The State need not show, as the Court implies, that the incremental cost of educating illegal aliens will send it into bankruptcy, or have a "'grave impact on the quality of education,'" *ante*, at 229; that is not dispositive under a "rational basis" scrutiny. In the absence of a constitutional imperative to provide for the education of illegal aliens, the State may "rationally" choose to take advantage of whatever savings will accrue from limiting access to the tuition-free public schools to its own lawful residents, excluding even citizens of neighboring States.[14]

Denying a free education to illegal alien children is not a choice I would make were I a legislator. Apart from compassionate considerations, the long-range costs of excluding any children from the public schools may well outweigh the costs of educating them. But that is not the issue; the fact

---

[13] The District Court so concluded primarily because the State would decrease its funding to local school districts in proportion to the exclusion of illegal alien children. 458 F. Supp., at 577.

[14] I assume no Member of the Court would challenge Texas' right to charge tuition to students residing across the border in Louisiana who seek to attend the nearest school in Texas.

that there are sound *policy* arguments against the Texas Legislature's choice does not render that choice an unconstitutional one.

## II

The Constitution does not provide a cure for every social ill, nor does it vest judges with a mandate to try to remedy every social problem. *Lindsey* v. *Normet*, 405 U. S., at 74. See *Reynolds* v. *Sims*, 377 U. S. 533, 624–625 (1964) (Harlan, J., dissenting). Moreover, when this Court rushes in to remedy what it perceives to be the failings of the political processes, it deprives those processes of an opportunity to function. When the political institutions are not forced to exercise constitutionally allocated powers and responsibilities, those powers, like muscles not used, tend to atrophy. Today's cases, I regret to say, present yet another example of unwarranted judicial action which in the long run tends to contribute to the weakening of our political processes.[15]

Congress, "vested by the Constitution with the responsibility of protecting our borders and legislating with respect to aliens," *ante*, at 237 (POWELL, J., concurring), bears primary responsibility for addressing the problems occasioned by the millions of illegal aliens flooding across our southern border. Similarly, it is for Congress, and not this Court, to

---

[15] Professor Bickel noted that judicial review can have a "tendency over time seriously to weaken the democratic process." A. Bickel, The Least Dangerous Branch 21 (1962). He reiterated James Bradley Thayer's observation that

"'the exercise of [the power of judicial review], even when unavoidable, is always attended with a serious evil, namely, that the correction of legislative mistakes comes from the outside, and the people thus lose the political experience, and the moral education and stimulus that comes from fighting the question out in the ordinary way, and correcting their own errors. The tendency of a common and easy resort to this great function, now lamentably too common, is to dwarf the political capacity of the people, and to deaden its sense of moral responsibility.'" *Id.*, at 22 (quoting J. Thayer, John Marshall 106–107 (1901)).

assess the "social costs borne by our Nation when select groups are denied the means to absorb the values and skills upon which our social order rests." *Ante*, at 221; see *ante*, at 223–224. While the "specter of a permanent caste" of illegal Mexican residents of the United States is indeed a disturbing one, see *ante*, at 218–219, it is but one segment of a larger problem, which is for the political branches to solve. I find it difficult to believe that Congress would long tolerate such a self-destructive result—that it would fail to deport these illegal alien families or to provide for the education of their children. Yet instead of allowing the political processes to run their course—albeit with some delay—the Court seeks to do Congress' job for it, compensating for congressional inaction. It is not unreasonable to think that this encourages the political branches to pass their problems to the Judiciary.

The solution to this seemingly intractable problem is to defer to the political processes, unpalatable as that may be to some.