INTERBORO INSTITUTE,
INC., Plaintiff,

v.

Robert J. MAURER, Individually and as President of Higher Education Services Corp.; H. Carl McCall, Individually and as Comptroller of the State of New York; Robert Attmore, Individually and as Deputy Comptroller of the State of New York; Richard P. Mills, Individually and as Commissioner of Education of the State of New York; Jeanine Grinage, Individually and as Deputy Commissioner for Higher and Professional Education of the New York State Department of Education; and Donald J. Nolan, Individually and as Former Commissioner for Higher and Professional Education of the New York State Department of Education, Defendants.

No. 96–CV–1955.

United States District Court,
N.D. New York.

Oct. 8, 1997.

Kraver & Levy, LLP (David M. Levy, of Counsel), New York, NY, for plaintiff.

Dennis C. Vacco, Attorney General for State of New York (Judith A. Avent, Asst. Atty. Gen., of Counsel), Albany, NY, for defendants.

## MEMORANDUM-DECISION & ORDER

McAVOY, Chief Judge.

## I. BACKGROUND

### A. Procedural History

Plaintiff, Interboro Institute, Inc. ("Interboro"), commenced this action against various present and former state officials of the New York State Comptroller's Office ("Comptroller"), the Department of Education and the Higher Education Services Corporation ("HESC"). The action arises from a determination of the Comptroller to disallow approximately $4.8 million of awarded financial aid funds forwarded to Interboro on behalf of students previously certified as eligible by the school for the Tuition Assistance Program ("TAP") and the Supplemental Tuition Assistance Program ("STAP").[1]

According to the defendants, the decision to seek repayment of these funds resulted from conducted audits of Interboro for the 1989–1990, 1990–1991 and 1991–1992 grant years, revealing that Interboro improperly certified many students as eligible for tuition assistance. Interboro, in turn, contends that the Comptroller's decision to disallow funds was motived by animus, subjecting it to selective treatment much different from other similarly situated colleges, in violation of its equal protection rights.[2]

For the reasons that follow, defendants' motion for summary judgment is granted.

### B. Facts

As required on a motion for summary judgment, the following facts are construed in the light most favorable to Interboro, the non-moving party. *Consarc Corp. v. Marine Midland Bank, N.A.,* 996 F.2d 568, 572 (2d Cir.1993).

Interboro is an accredited junior college located in New York City. Interboro is authorized to confer Associate in Occupational Studies degrees in six areas: accounting, business administration, paralegalism, secretarial sciences, security management and ophthalmic dispensing. Interboro enrolls approximately 1000 students, 95% of whom are minorities, and most of whom are women. Additionally, approximately 95% of the students receive TAP or STAP awards.

Because Interboro alleges that state officials acted out of animus and selectively enforced regulations against the school for the 1989–1992 years, the Court examines Interboro's historical relationship with the defendants. For purposes of clarity, the Court first examines Interboro's relationship with the Department of Education, and then surveys Interboro's relationship with the Comptroller as it relates to the conducted audits.

#### i) Registration Proceedings with the Department of Education

On May 4–6, 1983, the Education Department conducted a routine on-site evaluation of Interboro's programs. Numerous deficiencies were identified in the Education Department's final report, which was sent to Interboro. Based upon Interboro's response to the report, Deputy Commissioner Nolan registered Interboro until March 1, 1985, conditioned on Interboro's efforts to remedy the deficiencies.

In its first follow-up visit in October 1984, the Education Department concluded that Interboro had not made sufficient improvement in several remaining areas, such as remediation, the role of the faculty and at-

---

**1.** A post-secondary institution is required to certify to HESC that each student recipient is eligible for state aid under the statute and regulations. N.Y. Educ. Law § 665(3)(a). Payments are oftentimes made directly to the institution on behalf of the student. *Id.* § 665(3)(c)(i).

**2.** This Court previously dismissed Interboro's due process claim, and denied Interboro's motion to enjoin defendants from withholding TAP and STAP awards, in a Memorandum–Decision & Order dated February 18, 1997.

tendance. Nolan notified Interboro that conditional registration was extended until September 1, 1985, to permit Interboro to address these problems.

A second follow-up visit occurred on May 29–31, 1985. The team consisted of an Education Department representative and five professors and officials from Community Colleges across the state. The team reviewed course syllabi, textbooks, class schedules, library resources, instructional facilities, faculty resumes and student data. After review, the team concluded that Interboro had not made sufficient progress in correcting deficiencies. Specifically, the team found that the library was inadequate to support any of Interboro's programs, that the school exhibited pervase absenteeism, that grades were inflated, that classes offered were not of college level standards, that program requirements were modified to enable students to graduate and that credit was given to students who should have received a failing grade. Nolan thereafter decided not to register Interboro. Interboro appealed this decision internally.

That appeal, however, was suspended when Interboro commenced a federal action against the Education Department, seeking to prevent it from denying re-registration. *Interboro Institute, Inc. v. Ambach,* 86–CV–274 (N.D.N.Y.). The district court dismissed this action, and Interboro appealed to the Second Circuit.

Ultimately, Interboro withdrew its appeal to the Second Circuit, allowing the administrative appeal to continue. On appeal, the Commissioner decided that another site evaluation was required. The Commissioner reasoned that another site evaluation was warranted because of the conflicting allegations presented and the lapse of time since the last visit in 1985.

An evaluation team visited Interboro from February 23–27, 1990. The final report issued by the Education Department concluded that Interboro was deficient in four areas: admissions, remediation and student progress; faculty; and facilities. Specifically, the report found that Interboro did not require its students to meet its own published admissions criteria, that remediation efforts were inadequate as reflected by a nearly two-thirds drop-out rate for the 1985 academic year, that faculty members were overburdened and that the facilities were totally inadequate. Additionally, the Education Department received several letters of complaint about Interboro, including a petition signed by 100 students citing problems in admissions, remediation support services, class scheduling, faculty and facilities.

Thereafter, Nolan asked Interboro to submit a plan to bring the school into compliance with the regulations, which Interboro submitted. Nolan then concluded that Interboro continued to suffer from several weaknesses, but re-registered Interboro until September 1, 1994, conditioned upon Interboro submitting another plan to fully bring the school into compliance.

Interboro responded to Nolan's request by submitting another plan. Another staff team visited Interboro on May 23–24, 1994. Based upon Interboro's response and the on-site visit, Nolan informed Interboro that its remedial efforts were still inadequate; however, he would conditionally re-register the school until September 1, 1995.

On August 9, 1995, Nolan informed Interboro that it would be de-registered as of September 30, 1995. Nolan was dissatisfied with, among others, Interboro's refusal to require that applicants complete the tenth grade, given the school's five percent graduation rate after two years.

Interboro filed an administrative appeal. Based upon Interboro's willingness to cooperate with Education Department officials and to comply with the regulations, the Commissioner remanded the matter back to acting Deputy Commissioner Jeanine Grinage. The Commissioner instructed Grinage to conduct a re-registration review of Interboro by May 29, 1998. This review is presently ongoing.

#### ii) Audits

Contemporaneous with the above described registration proceedings, the Comptroller conducted audits of Interboro's administration of TAP and STAP awards. The Comptroller is compelled to audit an institu-

tion's compliance with the requirements for state aid, and to determine the amount of any overpayment to the institution on a student's behalf. N.Y. Educ. Law § 665(3)(c)(i). Thus the Interboro audits were directed to the propriety of funds already sent to Interboro on behalf of its students, based on certification by Interboro that its students met all requirements for the awards.

In October 1985, the Comptroller audited 1,686 TAP and STAP awards, totalling $1.6 million for 1,082 students in the 1984–1985 academic year. Following the audit, a preliminary report was issued proposing disallowances of certain TAP awards. Among the reasons cited by the Comptroller for withholding certain awards was Interboro's failure to observe its 10th grade entrance requirement. The Comptroller decided, however, to delay issuing a final report until resolution of the federal lawsuit described above.

With the close of the federal lawsuit in 1989, the Comptroller decided to commence a new audit based on more recent data. In March 1990, the Comptroller initiated another audit of Interboro, focusing primarily on the 1988–1989 academic year. The audit revealed that Interboro owed a refund of $228,-843 to the State. The final audit report disclosed that many award recipients had neither completed the tenth grade nor were over the age of 18 as required by Interboro's admission criteria. Further, many students failed to maintain good academic standing, or were not in full-time academic attendance. The HESC issued a refund demand to Interboro.

Shortly thereafter, Interboro commenced a federal lawsuit against the state, contending that it had been denied due process and equal protection of the laws. The district court denied Interboro's motion for a preliminary injunction. *Interboro Institute, Inc. v. Foley*, 91–CV–1272 (N.D.N.Y.). On appeal, the Second Circuit not only affirmed the denial of the preliminary injunction, but also remanded with instructions to dismiss the entire complaint. *Interboro Institute, Inc.,*

*v. Foley*, 985 F.2d 90 (2d Cir.1993). The court noted that "although Interboro asserts that the state agencies involved were 'out to get Interboro' and acted in bad faith, there is nothing in the record to support this claim." *Id.* at 93.

In light of the Education Department's review of Interboro's regulatory compliance in 1990 finding extensive deficiencies, the Comptroller commenced another audit of Interboro for the academic years 1989–1990, 1990–1991 and 1991–1992. During the course of the audit, audit Supervisor Kenneth Schulman obtained advice from Nolan regarding proper application of the regulations. Additionally, the Comptroller obtained a report from the Accrediting Commission for Independent Colleges and Schools, denying Interboro's application for a new grant of accreditation due to a variety of deficiencies.[3]

During the audited period, Interboro received on behalf of its 3,000 students TAP and STAP awards totalling approximately $9.3 million. The Comptroller audited the awards of 192 of the students certified as eligible by Interboro for state aid. A preliminary report was issued proposing disallowance of $700,504. Projecting this disallowance to the remaining unaudited students, the Comptroller proposed a disallowance of $6.9 million. Interboro responded to this report with written submissions, and a draft audit report reduced the proposed disallowance to $4.9 million. Interboro again replied with further submissions, and a final audit report was issued on November 16, 1996, concluding that Interboro had improperly certified students as eligible for TAP and STAP awards totalling $4,751,877.

In short, the audit report categorized disallowances in five general categories: (1) students not matriculated; (2) students not in good academic standing; (3) students not full-time; (4) TAP awards not credited to students' accounts; and (5) students not meeting residency requirements. Additionally, the audit disclosed that some students had not completed the tenth grade, were under the age of 19 or failed Interboro's

---

**3.** Interboro sued the accrediting commission, challenging this determination. The court, however, dismissed the suit. *Interboro Institute, Inc.* *v. Career College Assoc., Inc.,* 92–CV–9408 (S.D.N.Y.).

admission examination, and thus did not qualify for admission under Interboro's own published criteria.

By letter dated November 19, 1996, HESC notified Interboro that it must refund $4,796,132 plus interest. It further informed the school that until the sum was paid or other payment arrangements were made, the State would withhold all future TAP payments, subject to offset, up to the amount of the offset.

## II. DISCUSSION

### A. Standard for Summary Judgment

The standard for summary judgment is well-settled. A party seeking summary judgment must demonstrate that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party bears the initial burden of "informing the ... court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 56(c)). The initial burden is to demonstrate "that there is an absence of evidence to support the nonmoving party's case." Id. at 325, 106 S.Ct. at 2553.

The nonmoving party may defeat the summary judgment motion by producing sufficient evidence to establish a genuine issue of material fact for trial. *See id.* at 322, 106 S.Ct. at 2552. The test for existence of a genuine dispute is whether a reasonable juror could find for the nonmoving party; that is, whether the nonmovant's case, if proved at trial, would be sufficient to survive a motion for judgment as a matter of law. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250–51, 106 S.Ct. 2505, 2511–12, 91 L.Ed.2d 202 (1986).

In ruling on a motion for summary judgment, a Court is required to resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. *See Donahue v. Windsor Locks Bd., of Fire Comm'rs.,* 834 F.2d 54, 57 (2d Cir.1987). The nonmoving party, however, "must do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1355, 89 L.Ed.2d 538 (1986). Indeed, the nonmoving party's opposition may not rest on mere allegations or denials of the moving party's pleading, but "must set forth specific facts showing that there is a genuine issue for trial." Fed. R.Civ.P. 56(e). "The non-movant cannot escape summary judgment merely by vaguely asserting the existence of some unspecified disputed material facts, or defeat the motion through mere speculation or conjecture." *Western World Ins. Co. v. Stack Oil, Inc.,* 922 F.2d 118, 121 (2d Cir.1990) (citations and quotations omitted).

It is with the foregoing standards in mind that the Court turns to the issues presented.

### B. Equal Protection Claim

The Equal Protection Clause "is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr., Inc.,* 473 U.S. 432, 439, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1985) (citing *Plyler v. Doe,* 457 U.S. 202, 216, 102 S.Ct. 2382, 2394, 72 L.Ed.2d 786 (1982)). A violation of equal protection by selective enforcement arises if:

> (1) the person, compared with others similarly situated, was selectively treated; and (2) ... such selective treatment was based on impermissible considerations such as ... intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person.

*Crowley v. Courville,* 76 F.3d 47, 52–53 (2d Cir.1996) (stated in context of summary judgment motion) (quoting *LaTrieste Restaurant & Cabaret Inc. v. Village of Port Chester,* 40 F.3d 587, 590 (2d Cir.1994)) (further citation omitted).

In the present case, Interboro asserts that the defendants displayed animus towards the school, resulting in Interboro receiving selective treatment in violation of its equal protection rights. Defendants, by contrast, con-

tend that Interboro fails to meet either prong of the equal protection test. Specifically, defendants argue that Interboro cannot establish that it was selectively treated, or that application of such treatment was deliberately based on race religion or malice.

### i) Selective Treatment

With respect to the first prong of the equal protection claim, Interboro provides numerous examples of how it was allegedly treated selectively. For instance, Interboro alleges, *inter alia*, that the defendants attempted to apply a quota upon Interboro as to the number of students who could be admitted without a high school diploma or the equivalent; ignored the Comptroller's policy of not issuing reports based on data that is more than five years from the TAP year that was under audit; treated Interboro differently than Touro College by requiring a specific cut-off score on the institutions admission examination be published in the school's catalog; imposed a 745 minimum score on the Test of Adult Basic Education which was the standard for registered business schools, not a proprietary degree granting school like Interboro; treated Interboro differently from Audrey Cohen College regarding strict compliance with admissions standards as published in the college's catalog; and de-registered Interboro's program twice within ten years when no other school even once had their programs de-registered.

Defendants, in turn, rebut each of these points. For instance, defendants assert that it has never approved TAP funding, in the Collegiate College audit or any other audit, for graduating students who did not also meet published admissions criteria; that it has issued audits six years after the actual conduct of an audit on several occasions; that it requires all proprietary degree granting schools that publish TABE scores to require a score of at least 745; that it is the policy of the Comptroller and the Education Department to inform each other as critical issues emerge and that it would not be unusual that a school with Interboro's unique track record suffers de-registration twice.

■ After careful review, the Court cannot find that the defendants treated Interboro differently than other similarly situated schools. Rather, defendants were simply applying the regulations, policies and audit criteria established by law. Further, Interboro misconceives the inquiry when it argues that it was selectively treated because it was the only school ever to be de-registered. Merely because no other school has yet to be de-registered does not mean that imposing such a punishment in this case constitutes selective treatment. Plainly if another school also suffered from a similarly egregious record as that earned by Interboro, perhaps it too would be de-registered.

In any event, many of such arguments offered by Interboro miss the mark. Interboro brings this suit challenging the Comptroller's audit disallowance for the 1989–1992 grant years, not the Education Department's de-registration proceedings.

### ii) Selective Treatment Motivated by Bad Faith?

The Court also finds that Interboro flunks the second prong of its equal protection claim, as it provides no proof whatsoever that the defendants' decision to disallow state aid was motivated by animus or bad faith.

■ Interboro again relies on the fact that Nolan attempted to de-register the school on two occasions as evidence that Nolan displayed malice towards Interboro. Interboro forgets, however, that as a public official Nolan is obligated to apply the laws of the state. Here, no proof is offered that Nolan was not acting in accordance with his public duties, much less that Nolan was out to get Interboro. To the contrary, the evidence shows that Nolan time and time again gave Interboro second, third and fourth bites at the apple, allowing Interboro to respond to the reports and to correct the deficiencies cited. Similarly, no evidence has been offered that the Comptroller was not acting pursuant to statutorily obligated duties in conducting the audits for the 1989–1992 grant years.

■ Interboro takes issue with a number of the disallowances taken by the Comptroller. The Comptroller's decision to make such disallowances, however, is not sufficient to establish malice or bad faith. Further-

more, this Court need not decide the propriety of these disallowances, as this determination is one for the state court.[4]

### III.   Conclusion

For the reasons stated above, defendants' motion for summary judgment is GRANTED.·

**IT IS SO ORDERED.**

---

**4.**  Interboro, in fact, already has brought suit in state court contesting many of the Comptroller's disallowances.