Dr. T. Kenneth James, Commissioner Arkansas Department of Education 4 State Capitol Mall Little Rock, AR 72201-1071
Dear Dr. James:
I am writing in response to your request for my opinion on various questions relating to the following reported circumstances:
 An exchange student sponsor, on behalf of the exchange student who was to be placed with a host family in the Newport School District (Newport), did secure prior admission to Newport before he arrived in the United States. However, the host family failed to appear to accept the exchange student after he arrived in the United States. Thereafter, the exchange student sponsor had to arrange for the student to be placed with another host family in another school district, and were able to find a caretaker in the Jonesboro School District (Jonesboro). Jonesboro refused to admit the student for lack of prior written acceptance for enrollment, as provided under 22 C.F.R. 62.25(f)(1) and because the district has accepted its limit of exchange students under an alleged local policy which restricts the number of exchange students per year to four (4). In summary, Jonesboro claims that these federal regulations are in conflict with and preemptive of state law.
 A related scenario involves an exchange student who was placed with a family in Louisiana and was displaced as result of Hurricane Katrina. Due to displacement, this student eventually came to reside with a family in the Clinton School District. The Clinton School District refused to enroll the student based on a general policy against accepting any exchange students. However, presumably the Clinton School District is willing to enroll other Katrina or Rita displaced students pursuant to the McKinney[-]Vento Homeless Assistance Act.
Against this backdrop, you have posed the following questions:
 1. Are the provisions of Ark. Code Ann. §§ 6-18-201
and 6-18-202 in conflict with 22 C.F.R. 62.25, which implements the Mutual Educational and Cultural Exchange Act of 1961? If so, do the state statutes control or do the federal regulations addressing exchange student enrollment preempt Ark. Code Ann. §§ 6-18-201 and 6-18-202?
 2. If no conflict exists and ACA 6-18-201 and -202 control, are exchange students legally entitled to attend the Jonesboro School District or the Clinton School District based on the fact that the students are living in the school districts with persons standing in loco parentis due to reasons and circumstances not solely based on educational or school attendance purposes?
 3. If the federal regulations are controlling, does the U.S. Supreme Court's analysis in Doe v. Plyler
[sic: "Plyler v. Doe"], 457 U.S. 202 (1982), operate to make the Jonesboro or Clinton School District's limitation on the number of exchange students unconstitutional as a violation of the Equal Protection Clause?
 4. Would either the Jonesboro or Clinton exchange student possibly meet the definition of "homeless" under Sec. 725 of the McKinney-Vento Homeless Assistance Act and thereby require the school districts to admit the students?
 5. Does the Jonesboro or Clinton School District have the authority to adopt a policy to limit the enrollment of students who otherwise meet the legal requirements of Ark. Code Ann. §§ 6-18-201 and 6-18-202?
RESPONSE
With respect to your first question, although the law could benefit from legislative clarification, I do not believe the state and federal laws conflict. State law mandates that a student be accepted for enrollment if he qualifies as a "resident" of the district. A.C.A. § 6-18-201 (Supp. 2003). Federal law mandates that a foreign student be allowed to enter the United States and participate in a foreign exchange program if a receiving district accepts him for enrollment. See the Mutual Educational and Cultural Exchange Act of 1961,22 U.S.C. §§ 2451-2464 (West 2004). I do not see state and federal law as conflicting and accordingly do not consider preemption an issue. I believe a student who no longer qualifies to attend an Arkansas school pursuant to the Mutual Educational and Cultural Exchange Act might nevertheless qualify to attend a district school based, first, on the statutory authority of A.C.A. § 6-18-201, which obligates anyone having custody of a child or youth to enroll him in school, and, secondly, in all likelihood on the equal protection considerations articulated in Plyler v. Doe,457 U.S. 202 (1982), which ensure even illegal resident alien juveniles a right to an education in the United States. I do not believe the provisions of A.C.A. § 6-18-202 (Repl. 1999) preclude an individual present in the United States from enrolling in Arkansas as a foreign exchange student.
With respect to your second question, I believe the foreign students are entitled to attend school in the districts in which they temporarily reside both under the statutory authority of A.C.A. § 6-18-201 and, quite possibly, for the constitutional reasons discussed in Plyler.
I believe the answer to your third question is "no": Plyler
does not preclude a school district from limiting or barring the enrollment of foreign students under the Mutual Educational and Cultural Exchange Act. However, if a foreign child or youth, for whatever reason, finds himself residing in a particular Arkansas school district, Plyler may well mandate that the child or youth be afforded access to public education in the district.
With respect to your fourth question, I believe the foreign student displaced by Hurricane Katrina meets the definition of "homeless" set forth in the McKinney-Vento Homeless Assistance Act. 42 U.S.C. 11434a. The foreign student residing in the Jonesboro School District does not.
The answer to your fifth question is "no." Assuming, as you do in your question, that the students indeed meet the statutory requirements for enrollment eligibility, the school districts cannot declare them ineligible based upon a local policy.
Question 1: Are the provisions of Ark. Code Ann. §§ 6-18-201 and6-18-202 in conflict with 22 C.F.R. 62.25, which implements theMutual Educational and Cultural Exchange Act of 1961? If so, dothe state statutes control or do the federal regulationsaddressing exchange student enrollment preempt Ark. Code Ann. §§6-18-201 and 6-18-202?
In my opinion, with respect to foreign exchange students, the referenced state and federal laws can be reconciled, thus obviating the need to consider any issue of preemption. However, I will note that if a reviewing court were to conclude that federal and state law are in conflict regarding the eligibility of foreign exchange students to enroll in Arkansas schools willing to accept them, I believe federal law would preempt state law.
Subsection 6-18-201(a) of the Arkansas Code (Supp. 2003) provides in pertinent part:
 Under the penalty for noncompliance as shall be set by law, every parent, guardian, or other person residing within the State of Arkansas having custody or charge of any child age five (5) through seventeen (17) on or before September 15 of that year shall enroll and send the child to a public, private, or parochial school or provide a home school for the child, as described in § 6-15-501 et seq., with the following exceptions. . . .
None of the referenced exceptions applies in this case.
In Ark. Op. Att'y Gen. No. 96-064, one of my predecessors offered the following analysis of how this statute applies to a resident foreign exchange student whom a particular school does not wish to accept:
 This statute is not drafted to focus on a public school district's obligation to accept children to the school, but focuses, rather, on the obligation of the parents or other persons having "charge" of the child to send that child to school or provide a home school. Nonetheless, it is my opinion that if a foreign exchange student meets all the criteria for eligibility to attend school in a particular district, including age, residence,[1] etc., and makes application to attend public school, he or she should be admitted by the school district. It appears that the "host family" having "charge" of the exchange student would be subject to the appropriate penalties for not enrolling the child in some type of school. It can hardly be concluded that a parent or other person having "charge" of a child can be subjected to penalties for not enrolling the child in school while at the same time the school district has no obligation to admit the child to school. Gitelman, Domicile, Residence and Going to School in Arkansas, 37 Ark. L. Rev. 843, at 870.
I agree with my predecessor's analysis of this statute. Accord
N.H. Op. Att'y Gen. No. 82-100-I (opining that two resident foreign exchange students were entitled to attend public school under a materially indistinguishable New Hampshire statute, as well as under the equal protection clauses of the state and federal constitution).
As my predecessor further noted, what is now A.C.A. §6-18-202(b)(1) (Repl. 1999) contains the following provision:
 The public schools of any school district in this state shall be open and free through completion of the secondary program to all persons in this state between the ages of five (5) and twenty-one (21) years whose parents, legal guardians, or other persons having lawful control of the person under an order of a court reside within the school district. . . .
(Emphasis added.) My predecessor offered the following commentary on this statute:
 It would not appear that this statute would encompass foreign exchange students unless the host family were actually the "legal guardians" of the student or had control of the student pursuant to a court order.
Although I am inclined to agree with my predecessor, I cannot opine categorically that A.C.A. § 6-18-202(b)(1) is inapplicable to foreign exchange students. The exact meaning of the term "legal guardians" as used in this statute may be subject to debate. The subchapter of the Code containing A.C.A. §6-18-202(b) does not define the term "legal guardian." The term "guardian" frequently denotes a relationship arising from a court appointment. See, e.g., A.C.A. § 28-65-101(3) (Repl. 2004) (defining the term to mean "one appointed by a court to have the care and custody of the person or of the estate, or of both, of an incapacitated person"). However, within the context of the subchapter at issue, a court might adopt the following definition set forth at A.C.A. § 5-14-101(3) (Supp. 2005):
 "Guardian" means a parent, stepparent, legal guardian, legal custodian, foster parent, or anyone who by virtue of a living arrangement is placed in an apparent position of power or authority over a minor.
(Emphasis added.) Compare Department of Human Services v.Parker, CA 04-311 (Ark.App. 11-3-2004) (applying this definition, which is contained in a statute dealing with sexual offenses, in the context of child abuse). Black's LawDictionary (8th ed. 1999) similarly defines the term "guardian" to mean: "One who has the legal authority and duty to care for another's person or property, esp. because of the other's infancy, incapacity, or disability." Although Black's defines a wide range of guardianships, it contains no definition of the term "legal guardian," suggesting that the term may not have a fixed legal meaning. Nevertheless, despite these broader definitions of the term "guardian," I am struck by the fact that even A.C.A. § 5-14-101(3) acknowledges the term "legal guardian" as denoting a subcategory of "guardian" distinct from an individual merely exercising custodial control, thus supporting an inference that the legislature intended the term to denote a court appointee. Accordingly, I agree with what appears to be my predecessor's assumption that the statutory term "legal guardians" is thus limited.
Irrespective of whether A.C.A. § 6-18-202(b)(1) might apply to authorize a foreign exchange student's enrollment in public school, an issue remains as to whether A.C.A. § 6-18-202(b)(2) might apply expressly to foreclose the student's enrollment. Subsection 6-18-202(b)(2) provides:
 For purposes of this section, a student may use the residential address of a legal guardian, person having legal lawful control of the student under order of a court, or person standing in loco parentis only if the student resides at the same residential address and if the guardianship or other legal authority is not granted solely for educational needs or school attendance purposes.
(Emphasis added.) Subsection 6-18-202(d) further provides:
 In order for a person under the age of eighteen (18) years to establish a residence for the purpose of attending the public schools separate and apart from his or her parents, guardians, or other persons having lawful control of him or her under an order of a court, the person must actually reside in the district for a primary purpose other than that of school attendance.
(Emphasis added.) The latter statute would appear to apply if a host family were not deemed to be the "guardians" of an exchange student. In Ark. Op. Att'y Gen. No. 98-283, one of my predecessors, apparently assuming that a host family would not qualify as "guardians," opined that this statute mandates that a court test on a case-by-case basis any school district policy foreclosing the enrollment of foreign students, inquiring whether any given child or youth "actually reside[s] in the district for a primary purpose other than that of school attendance." CompareMartinez v. Bynum, 461 U.S. 321 (1983) (upholding a Texas statute that conditioned school attendance upon "residency" defined as including an intention to remain permanently in the district).
Although I recognize the possibility that the "primary purpose" of foreign exchange study may be characterized as "school attendance," I consider that far from a foregone conclusion inasmuch as the stated purpose of the exchange program is not merely "educational" but also "cultural." 22 U.S.C. § 2451 (West 2004). Indeed, given the presumed availability of "school attendance" in a foreign exchange student's home country, one might naturally conclude that the "primary purpose" of a student's participation in the exchange program is broader. In any event, however one characterizes the "primary purpose" of foreign exchange study, I do not believe the legislature intended the highlighted language from the statutes quoted above to foreclose foreign exchange students from attending school in Arkansas school districts willing and able to enroll them. Rather, I believe the legislature intended the statutes to foreclose Arkansas students from changing their residences away from their parents, guardians or court-approved custodians solely to attend schools they prefer over the ones in their districts.[2] I appreciate that the literal language of the statute might be read more restrictively. Nevertheless, I believe my proposed reading of the statutes draws support from the accepted principle of statutory construction that the reason and spirit of an act should take precedence over the letter of an act where adherence to the letter of the act would result in an absurdity or would defeat the plain purpose of the law. Williamsv. City of Pine Bluff, 284 Ark. 551, 683 S.W.2d 923 (1985). In my opinion, it would be absurd to suggest that the legislature would so obliquely undertake to prohibit willing school districts from engaging in federally sanctioned cultural and educational exchange.
The Mutual Educational and Cultural Exchange Act of 1961 (the "Act"), which is codified at 22 U.S.C. §§ 2451-2464 (West 2004), authorizes the foreign student exchange program referenced in your request. The specific program provisions are set forth at22 C.F.R. Part 62, Subpart B. With respect to the enrollment of foreign students in domestic school districts, § 62.25 provides in pertinent part:
(f) Student enrollment
 (1) Sponsors shall secure prior written acceptance for the enrollment of any student participant in a United States public or private secondary school. Such prior acceptance shall:
 (i) Be secured from the school principal or other authorized school administrator of the school or school system that the student participant will attend;
* * *
 (4) Under no circumstance shall a sponsor facilitate the entry into the United States of a student for whom a school placement has not been secured.
 (5) Sponsors shall not facilitate the enrollment of more than five students in one school unless the school itself has requested, in writing, the placement of more than five students.
The federal legislation and regulation clearly anticipate that no foreign exchange student will enter the United States until the student's sponsor has obtained the permission of a particular school to enroll the foreign student. Assuming the sponsor has indeed obtained such permission, which appears to have been the case with both of the students at issue in your request until unanticipated circumstances mandated their reassignment, and further assuming the students remain in the districts to which they were initially assigned, which appears not to have occurred in these cases, there would clearly be no conflict between the state and federal law recited above: the students would be entitled to attend the schools under both state and federal law.
A different analysis applies if a foreign student, whether by reassignment of a host family or otherwise, finds himself residing in a school district that has not accepted the student for enrollment, as appears to be the case in both of the scenarios described in your request. In my opinion, under such circumstances, the student might further be entitled to enroll in a school located within the district where he resides not only under the state statutes discussed above but also under constitutional principles of equal protection. In Plyler v.Doe, 457 U.S. 202, 221 (1982), the United States Supreme Court declared:
 Public education is not a "right" granted to individuals by the Constitution. San Antonio Independent School Dist. v. Rodriguez, 411 U.S. 1, 35 (1973). But neither is it merely some governmental "benefit" indistinguishable from other forms of social welfare legislation. Both the importance of education in maintaining our basic institutions, and the lasting impact of its deprivation on the life of the child, mark the distinction.
In acknowledgment of the importance of education, the Court fashioned the following intermediate level of scrutiny of laws abridging access to education:
 If the State is to deny a discrete group of innocent children the free public education that it offers to other children residing within its borders, that denial must be justified by a showing that it furthers some substantial state interest.
Id. at 230. The Court applied this principle by expressly holding that a statute denying a generally available free public education to illegal immigrant children violated the equal protection clause of the United States Constitution. Id. Seealso Ark. Const. art. 2, §§ 2 and 3 (likewise guaranteeing equal protection under the laws). It would appear logical that if illegal immigrants are entitled to a free public education, so would be a foreign exchange student who, through no fault of his own, finds himself residing in a district other than the one his sponsor had initially arranged as a residence. See N.H. Op. Att'y Gen. No. 82-100-I (invoking Plyler in support of the proposition that the equal protection clause would foreclose a school district from declining to enroll foreign exchange students residing within the district).
I should note, however, that case law issued subsequent toPlyler and the New Hampshire Attorney General's application of that case has stressed the narrowness of Plyler's scope. For instance, in Kadrmas v. Dickinson Public Schools, 487 U.S. 450,459 (1988), the United State Supreme Court remarked that it had "not extended this holding beyond the `unique circumstances,'id., at 239 (Powell, J., concurring), that provoked its `unique confluence of theories and rationales,' id., at 243 (Burger, C.J., dissenting)." Quoting Plyler, supra. See alsoMartinez v. Bynum, 461 U.S. 321, 327 (1983) ("A bona fide residence requirement, appropriately defined and uniformly applied, furthers the substantial state interest in assuring that services provided for its residents are enjoyed only by residents."). The Court in Martinez relied on this principle to uphold the constitutionality of a Texas statute that is materially indistinguishable from A.C.A. § 6-18-202(d).461 U.S. at 425-33. However, I must stress again that I do not read either A.C.A. § 6-18-202(d) or A.C.A. § 6-18-202(b)(2) as precluding a foreign exchange student from attending an Arkansas school that is willing and able to accommodate him.
Finally, I will briefly address the issue of preemption. Assuming a reviewing court were to conclude that A.C.A. §§ 6-18-202(b)(2) and -202(d), considered in isolation, would prevent a foreign exchange student from attending school in an Arkansas district, the court would then have to consider whether provisions of federal law preempted these statutes. As the United States Supreme Court declared in Crosby v. National Foreign TradeCouncil, 530 U.S. 363, 372-73 (2000):
 A fundamental principle of the Constitution is that Congress has the power to preempt state law. Art. VI, cl. 2; Gibbons v. Ogden, 9 Wheat. 1, 211 (1824); Savage v. Jones, 225 U.S. 501, 533 (1912); California v. ARC America Corp., 490 U.S. 93, 101
(1989). Even without an express provision for preemption, we have found that state law must yield to a congressional Act in at least two circumstances. When Congress intends federal law to "occupy the field," state law in that area is preempted. Id.,
at 100; cf. United States v. Locke, 529 U.S. 89, 115 (2000) (citing Charleston Western Carolina R. Co. v. Varnville Furniture Co., 237 U.S. 597, 604
(1915)). And even if Congress has not occupied the field, state law is naturally preempted to the extent of any conflict with a federal statute. Hines v. Davidowitz, 312 U.S. 52, 66-67 (1941); ARC America Corp., supra, at 100-101; Locke, supra, at 109. We will find preemption where it is impossible for a private party to comply with both state and federal law, Florida Lime Avocado Growers, Inc. v. Paul, 373 U.S. 132, 142-143 (1963), and where "under the circumstances of [a] particular case, [the challenged state law] stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." Hines, supra, at 67. What is a sufficient obstacle is a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects:
 "For when the question is whether a Federal act overrides a state law, the entire scheme of the statute must of course be considered and that which needs must be implied is of no less force than that which is expressed. If the purpose of the act cannot otherwise be accomplished — if its operation within its chosen field else must be frustrated and its provisions be refused their natural effect — the state law must yield to the regulation of Congress within the sphere of its delegated power."
 Savage, supra, at 533, quoted in Hines, supra, at 67, n. 20.
(Footnote omitted; brackets in original.)
As reflected in my preceding summary of the Act, Congress authorized the foreign exchange program to encourage willing and able school districts to accommodate foreign students, thereby promoting cultural and educational exchange. Congress further authorized private, qualifying individuals to host foreign youths to promote these same goals. In my opinion, these purposes would clearly be frustrated if one were to enforce a provision of state law that would preclude an otherwise qualifying foreign student from participating in the program. Accordingly, I believe any state law that conflicts with the federal criteria for participating in the foreign exchange program under the Act would be preempted. However, having ventured this opinion, I will again state that I see no such conflict between state and federal law.
Question 2: If no conflict exists and ACA 6-18-201 and — 202control, are exchange students legally entitled to attend theJonesboro School District or the Clinton School District based onthe fact that the students are living in the school districtswith persons standing in loco parentis due to reasons andcircumstances not solely based on educational or schoolattendance purposes?
For the reasons stated in my response to your first question, I believe the exchange students are entitled to attend the Jonesboro School District and the Clinton School District, respectively. I will again note that A.C.A. § 6-18-201(a) would independently appear not only to create an entitlement for the exchange students to attend school in the districts in which their host families reside, but further to impose upon the host families an obligation to enroll the students in district schools or otherwise provide for their educations. Under that statute, any Arkansas resident "having custody of any child" within the recited age range "shall enroll and send the child to a public, private, or parochial school or provide a home school. . . ." Although you appear to assume in your question that either state or federal statutory law will control in resolving this issue, as I suggested in my previous answer, I see no disharmony between the two.
I gather from the way you have phrased your question that you are concerned to determine whether a student's participation in the foreign exchange program might be characterized as "solely for educational needs or school attendance purposes," A.C.A. §6-18-202(b)(2) — a characterization that, if accurate, you apparently feel would preclude the student's enrollment under the terms of that statute. As discussed in my response to your previous question, I believe (1) that a host family clearly stands in loco parentis to a foreign exchange student; (2) that the cultural, as distinct from purely educational, elements of foreign exchange participation very likely render the statutory language just quoted inapplicable to a foreign exchange student; (3) that the legislature in all likelihood never intended this statute to apply to foreign exchange students; and (4) that federal law would preempt state law on this subject if the two were read as conflicting. I will not here repeat my bases for drawing these conclusions.
Question 3: If the federal regulations are controlling, does theU.S. Supreme Court's analysis in Doe v. Plyler [sic: "Plyler v.Doe"], 457 U.S. 202 (1982), operate to make the Jonesboro orClinton School District's limitation on the number of exchangestudents unconstitutional as a violation of the Equal ProtectionClause?
As I noted in my response to your first question, the Court inPlyler held that principles of equal protection mandate that the children of illegal aliens be afforded access to education in the United States. Although the case has been very narrowly construed, it may support requiring a school district to enroll a foreign exchange student temporarily living in the district.
Specifically in response to your question, I am unaware of any provision of constitutional law that would preclude a school district from adopting a policy limiting or foreclosing its participation in the foreign exchange program. However, once a foreign student arrives in a particular school district in the United States, whether he does so illegally or legally, as reportedly was the case with the students at issue, I believe the principles set forth in Plyler might well mandate that he be admitted to school in that district. To this extent, then, any policy limiting or flatly prohibiting foreign exchange students in a particular district might well be trumped by the equal protection clause of the U.S. Constitution if, for whatever reason, a foreign child winds up residing in a particular U.S. school district.[3]
Question 4: Would either the Jonesboro or Clinton exchangestudent possibly meet the definition of "homeless" under Sec. 725of the McKinney-Vento Homeless Assistance Act and thereby requirethe school districts to admit the students?
The Stewart B. McKinney Homeless Assistance Act of 1987, renamed the McKinney-Vento Homeless Assistance Act in 2000,42 U.S.C. 11411 et seq. (West 2005), contains the following provisions:
 (1) Each State educational agency shall ensure that each child of a homeless individual and each homeless youth has equal access to the same free, appropriate public education, including a public preschool education, as provided to other children and youths.
 (2) In any State that has a compulsory residency requirement as a component of the State's compulsory school attendance laws or other laws, regulations, practices, or policies that may act as a barrier to the enrollment, attendance, or success in school of homeless children and youths, the State will review and undertake steps to revise such laws, regulations, practices, or policies to ensure that homeless children and youths are afforded the same free, appropriate public education as provided to other children and youths.
42 U.S.C. 11431. Subsection 42 U.S.C. 11432g(2)(E) provides in pertinent part:
 If a dispute arises over school selection or enrollment in a school —
 (i) the child or youth shall be immediately admitted to the school in which enrollment is sought, pending resolution of the dispute[.]
Section 11434a. provides in pertinent part:
(2) The term "homeless children and youths" —
* * *
(B) includes —
 (i) children and youths who are sharing the housing of other persons due to loss of housing, economic hardship, or a similar reason[.]
In my opinion, based upon your factual recitation, this definition would include the exchange student displaced by Hurricane Katrina and now residing in the Clinton School District. I do not believe this definition would apply to the exchange student residing in the Jonesboro School District. But, again, I believe both students are entitled to enroll in the districts in which they reside based upon A.C.A. § 6-18-201(a) and, in all likelihood, based upon the reasoning set forth inPlyler.
Question 5: Does the Jonesboro or Clinton School District havethe authority to adopt a policy to limit the enrollment ofstudents who otherwise meet the legal requirements of Ark. CodeAnn. §§ 6-18-201 and 6-18-202?
Given the way you have phrased your question, the answer is clearly "no." A school district lacks the authority to adopt any policy that would render ineligible for enrollment children or youths who meet the criteria for enrollment established by the legislature.
As stated in my previous responses, I do believe these school districts may adopt a policy limiting or foreclosing altogether their participation in the foreign exchange student program; no provision of the pertinent federal legislation or regulations mandates that school districts participate in this program. However, A.C.A. §§ 6-18-201 and -202 apply generally to children and youths who are in the custody of district residents. In my opinion, even if a school district has adopted a policy of not participating in the foreign exchange student program, if a foreign child or youth somehow winds up in the custody of a district resident, that district will be obliged to allow the student to enroll in school both under Arkansas statutory law and under the constitutional law discussed in Plyler.
Assistant Attorney General Jack Druff prepared the foregoing opinion, which I hereby approve.
Sincerely,
MIKE BEEBE Attorney General
MB/JHD:cyh
[1] Subsection (a)(2) of the statute defines the term "resident" as meaning "a student whose parents, legal guaradians [sic: `guardians'], persons having legal, lawful control of the student under order of a court, or persons standing in locoparenis [sic; `parentis'] reside in the school district" (emphasis added). I believe the highlighted language clearly applies to the host family of a foreign exchange student, meaning that the student would qualify as a "resident" under this statute.
[2] In this regard, I should note that even this restriction has been significantly mitigated by the legislature's subsequent enactment of the Arkansas Public School Choice Act of 1989, A.C.A. § 6-18-206 (Supp. 2003), which provides that a student may elect to apply for admission to a school outside the district so long as his enrollment there would not "adversely affect the desegregation of either district" and his enrollment would not offend inter-district transfer criteria established by the receiving district.
[3] Notwithstanding the contrary suggestion in your question, the issue of whether the Court's ruling in Plyler might preclude the Jonesboro or Clinton School District from limiting the number of exchange students appears totally unrelated to the issue of whether "federal regulations are controlling." As I suggested in my response to your first question, if limiting the number of exchange students would offend the equal protection clause of the U.S. Constitution, it would be immaterial whether federal or state statutory law would otherwise have controlled.