BAKER, Judge,
dissenting.
[28] When the plaintiff in a civil action is also an undocumented immigrant, the majority concludes that juries and experts cannot determine an appropriate award of damages for loss of future income without first considering the plaintiffs immigration status. I do not see how such evidence would be of any use in arriving at a more appropriate award of damages, and I believe that it will likely result in prejudice to the injured party and serve as a bad incentive for those who employ undocumented immigrants. I respectfully dissent.
[29] Of the many factors that the majority recognizes as relevant to the calculation of damages for loss of future income, one’s present immigration status is certainly the least relevant. This is in part because, unlike other factors, an individual’s ability to remain in this country is a function of the law, and historically, immigration law has been subject to substantial change. See Wendy Andre, Undocumented Immigrants and their Personal Injury Actions: Keeping Immigration Policy Out of Lost Wage A%vards and Enforcing the Compensatory and Deterrent Function of Tort Law, 18 Roger Williams U.L. Rev. 580, 534-42 (2008) (discussing the historical development of U.S. immigration law). For instance, the Immigration Control and Reform Act of 1986 (IRCA) allowed previously undocumented immigrants who met certain «criteria to become lawful residents. 8 U.S.C. § 1255a; see Kati L. Griffith, A Supreme Stretch: The Supremacy Clause in the Wake of IRCA and Hoffman Plastic Compounds, 41 CORNELL Int’l L.J. 127, 129 (2008) (noting that the IRCA gave amnesty to over a million .undocumented immigrants). Such sweeping changes to immigration law could occur at any time. This means that an individual’s current immigration status is not a reliable predictor of that individual’s future immigration status.
[30] Even in the absence of any changes to the law, immigrants who remain undocumented face a remarkably low risk of deportation. Salas, 230 P.3d at 585. The Department of Homeland Security (DHS) estimated that 11.4 million undocumented immigrants resided in this country in 2012. DHS, Estimates op the Unauthorized Immigrant Population Residing in the United States: Januahy 2012, ■ (March, 2013) available at https://www. dhs.gov/sites/default/ffles/publicatiqns/ois_ ill_pe_2012_2.pdf. In that same year, DHS removed an all-time high of approximately 419,000 undocumented immigrants. DHS,, Immigration Enforcement , Actions: 2012, (Dec., 2013) available at https://www.dhs. gov/sites/default/files/publications/ois_ enforcement_ar_2012_l.pdf. This record number of removals amounted to only 3.7 percent of the total undocumented population. Removals are presently on a downward trajectory, with the number of undocumented immigrants removed by DHS falling to approximately 235,000 in 2015. DHS, ICE Enforcement, and Removal Operations Report, (Dec. 22, 2015) available at https://www.ice.gov/sites/default/files/ documents/Report/2016/fy2015removal Stats.pdf.
[31] However, this present trajectory says little about the likelihood that a par *1024 ticular immigrant will face deportation in any subsequent year. Apart from changes brought through legislation, one’s ability to remain in this country will also depend on executive enforcement decisions. DHS has recognized that its ability to remove undocumented immigrants is limited and that it must exercise .discretion in .allocating its resources. Its current Secretary has promulgated a memorandum identifying certain undocumented immigrants as priorities for removal, including individuals deemed to be threats to national security or public safety. Memorandum from Jeh Johnson, Sec’y, DHS, to Thomas S. Win-kowski, Acting Dir., U.S. Immigration and Customs Enforcement, et al. (Nov. 20, 2014), available at https://www.dhs.gov/ sites/default/fíles/publications/14_íl20_ memo_prosecutorial_discretion.pdf. This means that little can be known about an undocumented immigrant’s chances of removal without knowing whether that person is currently a priority in the eyes of DHS.
[32] DHS has also issued guidance, which has been the subject of much recent discussion, known as Deferred Action for Parents of Americans and Lawful Permanent Residents (DAPA). Memorandum from Jeh Johnson, Sec’y, DHS, to Leon Ródriguez, Dir., U.S. Citizenship and Immigration Services, et'al. (Nov. 20,'2014), available at https://www.dhs.gbv/sites/ default/files/publications/14_1120_memo_ deferred_action.pdf. Pursuant to DAPA, undocumented immigrants who meet certain criteria‘may be eligible for deferred action, meaning DHS will hot seek to remove them for a period of time. Id. Qualified individuals may also be eligible for work authorization. Id. As amicus for Es-camilla notes, forty-six percent of Indiana’s undocumented population could apply for deferred action- under DAPA. Brief of the Ind. Trial Lawyers Ass’n at 9. Thus, one would not want to- predict the likelihood that an undocumented immigrant will remain in this country without first considering whether that person is eligible for DAPA. But, as of today, it would be premature to make any predictions related to DAPA, as the United States Supreme Court is set to hear a challenge to DAPA in April. United States v. Texas, — U.S. -, 136 S.Ct. 906, 193 L.Ed.2d 788 (2016).
[33] Thus, because one’s immigration status is defined by law, it is subject to sudden and often unpredictable change depending on decisions made across all branches of -the federal government. Keeping this in mind, it seems clear that the only thing to be inferred from Escamil-la’s present immigration status is that his chance of someday facing deportation is something above zero. I do not believe that juries would be able to put this information to any productive use, nor do I believe that it could — or should — affect the considerations of experts. It bears remembering that the experts in Ortiz, relied upon by the majority, found that the possibility that the plaintiff would be deported was “statistically insignificant.” 2015 WL 1498713 at *7-8. I cannot imagine how a different conclusion could be reached judging from one’s immigration status alone. I therefore believe that it would be wise to presume the insignificance of one’s immigration status.
[34] Allowing consideration of the issue may also diminish the effectiveness of state tort law. Undocumented immigrants are “subject to the full range of obligations” and “entitled to the equal protection” of the civil and criminal laws of this State. Plyler v. Doe, 457 U.S. 202, 215, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982) (noting that the Fourteenth Amendment applies to any person within the jurisdiction of a state). They are accordingly entitled to seek redress in our courts. See also *1025 Ind. Const, art. 1, § 12 (“All courts shall be open; and every person, for injury done to him ... shall have remedy by due course of law”) (emphasis added). However, as noted by the amicus, undocumented immigrants are reluctant to turn to the courts for . fear of immigration consequences. Brief of the Ind. Trial Lawyers Ass’n at 12-13. Were one’s immigration status to become an issue in civil actions such as this, both parties would be compelled to present evidence as to the likelihood, or lack thereof, of an immigrant’s removal. This could potentially transform a tort case into a battle of immigration experts, taking focus away from the injury to be redressed. Trial would become a much more costly proposition simply because it involved an undocumented immigrant. This would serve as a further disincentive for immigrants to seek relief in our court system.
[35] Moreover, if one’s immigration status were to have any impact on the outcome of tort cases, it would certainly be to lower the damages awarded to the injured individual. For this: reason, I fear that injecting immigration státus into such matters would serve as a bad incentive for employers. Because of the substantial difference between U.S. wages' and those, paid in neighboring countries, employers would know that they have a chance of paying substantially less in damages to an injured undocumented immigrant. Industries that commonly rely on immigrant labor — industries which, as noted by the amicus, often tend to be dangerous — would have less of an incentive to ensure worker safety. Brief -of the Ind. Trial Lawyers Ass’n at 9-10 (noting that undocumented immigrants make up a substantial percentage of the workforce in industries such as construction and meatpacking). Simply put, the deterrent effect of tort law would apply with less force to those who employ undocumented immigrants. As deterring negligent conduct-is one of tort law’s primary goals, this should not be the case. Hanson v. St. Luke’s United Methodist Church, 704 N.E.2d 1020, 1027 (Ind.1998).
[36] Finally, it is important to keep in mind that many of these cases will be tried before juries. Our Rules of Evidence acknowledge that juries can be subject to prejudice. See Evid. R. 403. Numerous courts have recognized the obvious potential for prejudice surrounding the issue of immigration, and the. majority acknowledges this potential as well. Op. at 1022; Salas, 230 P.3d at 586-87 (discussing holdings in other courts recognizing the potential for prejudice surrounding immigration). However, despite acknowledging this potential, the majority concludes that because there is “some risk of deportation,” “the prejudicial effect of that evidence therefore currently does not outweigh its probative value.” Id. Thus, the majority appears to oonclude that, if evidence of immigration status is relevant, its relevance outweighs its prejudicial .effect. This is not an udequate Rule 403 analysis as it fails to take account of the prejudicial effect of the evidence.
[37] Assuming for argument’s sake that one’s immigration status may be relevant under certain circumstances, in my opinion, this relevance would almost always be outweighed by its prejudicial effect. If immigration status is to be put before the jury at all, the party seeking to introduce evidence of an opponent’s immigration status — or seeking to exclude evidence that fails to take account of that status — should first be required to establish that his opponent faces an imminent likelihood of deportation. Only after such a likelihood has been established would the probative value of such evidence have any chance of outweighing, its prejudicial impact. While this is ■, not my preferred way *1026 of handling the issue, it is an outcome I would be willing to accept.
[38] For the foregoing reasons, I respectfully dissent.